**THEDFORD CROSSING, L.P., Appellant,**

v.

**TYLER ROSE NURSERY, INC., Joe D. Tew, John A. Williams, III, and WH Group, Inc. d/b/a East Texas Realty, Appellees.**

No. 12–08–00089–CV.

Court of Appeals of Texas, Tyler.

Jan. 29, 2010.

---

Deron R. Dacus, Shannon M. Dacus, Deleith Duke Gossett, Ramey & Flock, Tyler, Gregory D. Smith, for Appellant.

T. Heath Chamness, Clay M. White, Parker White, Michael E. Gazette, Tyler, for Appellee.

Panel consisted of WORTHEN, C.J., and HOYLE, J.

## OPINION

BRIAN T. HOYLE, Justice.

Tyler Rose Nursery, Inc., Joe D. Tew, John A. Williams, III, and WH Group, Inc. d/b/a East Texas Realty have filed a motion for rehearing, which is denied. We withdraw our opinion of December 16, 2009 and substitute the following opinion in its place.

Thedford Crossing, L.P. appeals the trial court's take nothing judgment entered in favor of Appellees, Tyler Rose Nursery, Inc., Joe D. Tew, John A. Williams, III, and WH Group, Inc. d/b/a East Texas Realty. Thedford raises four issues on appeal. We reverse and remand.

### BACKGROUND

In 2003, Joe D. Tew and his company, Tyler Rose Nursery, Inc. (collectively "Tew") contracted with representatives of the T.M. Morriss Family Limited Partnership,[1] whereby Tew agreed to sell and Thedford agreed to buy approximately 361 acres of undeveloped commercial property located near the intersection of Interstate 20 and Highway 69. The contract provided for a cash sale of the property for $6,000,000. Thedford subsequently paid a $50,000 fee to extend the closing date of the contract by one year.

In August 2005, during the period of the extension, the parties entered into an amended contract, which stated, in pertinent part, as follows:

H. *Other Modifications:*

This option contract shall close on/or before November 15, 2005 or terminate with no further options or extensions. Seller and Purchaser have agreed to close one of two ways:

1. Payment of the original purchase price of $6,000,000 or

2. Purchaser, by notifying Seller by November 1, 2005, shall pay Seller $2,000,000 with mutual agreement to the following terms and conditions:

a. The total purchase price shall be raised to $10,000,000.

b. Seller shall release 50 contiguous acres to purchaser, such land to be mutually agreed upon.

c. Further releases to purchaser shall be at the rate of $1.00 per sq. ft. and shall be in 10 acre minimums.

d. The final closing date shall be extended to November 15, 2009 with any remaining balance due and payable by that date.

Thedford elected to proceed under the seller financed option set forth in paragraph (H)(2) and deposited the $2,000,000 into escrow. Thereafter, the parties sought to negotiate the location of the fifty contiguous acres to be released pursuant to paragraph (H)(2)(b) of the contract.

However, as the date for closing approached, the parties had not reached an agreement concerning the location of the fifty acre tract. At closing,[2] Tew set forth

1. The buyer formed Thedford Crossing, L.P. ("Thedford") prior to the date set for closing and assigned Thedford its rights under the contract. For ease of reference, we refer to the buyer as "Thedford."

2. The parties sought to execute closing documents on November 15, 2005. Throughout the opinion, we refer to this meeting as the "closing." The parties' reference to "final closing" in paragraph (H)(2)(d) of the agreement is, from the plain language used, a date upon which the balance of the sales price is

that he would agree to the fifty acre tract Thedford proposed and proceed with the transaction if Thedford would agree to certain restrictions on future partial releases. Ultimately, the parties could not agree on the location of the fifty acre tract, and the sale was not closed.

Thedford filed the instant suit on November 18, 2005 alleging, among other causes of action, breach of contract and fraud. The matter proceeded to a jury trial. At the conclusion of Thedford's presentation of evidence, the trial court entered a directed verdict on Thedford's fraud claim. Subsequently, prior to the submission of the case to the jury, the trial court, over Thedford's objection, conditioned the submission of Question 2 of the court's charge on the jury's affirmative response to Question 1. These questions in the court's charge inquire of the jury as follows:

## QUESTION NO. 1:

Did THEDFORD CROSSING, L.P. and TYLER ROSE NURSERY, INC. and JOE D. TEW enter into a contractual agreement on the location and configuration of a tract of 50 acres to be released to THEDFORD CROSSING, L.P. at the closing for the sale and purchase of the 361.917 acres of land located in Smith, County, Texas?

ANSWER "YES" OR "NO"

ANSWER: _____

IF YOU HAVE ANSWERED QUESTION NO. 1 "YES" THEN ANSWER QUESTION NO. 2. OTHERWISE DO NOT ANSWER QUESTION NO. 2[.]

due to Tew. Any reference made to the November 15, 2009 date will describe it as "final closing."

## QUESTION NO. 2:

Did TYLER ROSE NURSERY, INC. and JOE D. TEW fail to comply with a material obligation of their agreement with THEDFORD CROSSING, L.P. to sell and convey to THEDFORD CROSSING, L.P. the 361.917 [acre] tract of land located at I–20 and Jim Hogg Road in Smith County, Texas at the closing on November 15, 2005?

ANSWER YES OR NO

ANSWER: _____

The jury answered "No" in response to Question 1 and, pursuant to the trial court's instruction, did not answer Question 2. Accordingly, the trial court entered a take nothing judgment against Thedford, and this appeal followed.[3]

### Charge Error—Improperly Conditioned Question

In its first issue, Thedford argues that by conditioning Question 2 on the jury's affirmative answer to Question 1, the trial court erroneously charged the jury under a legally incorrect interpretation of the parties' contract. Specifically, Thedford contends that the parties' agreement concerning the location of the fifty acre tract was not a condition precedent to closing the sale of the property.

#### Standard of Review

 If an erroneous conditional submission deprives a party of the submission of an issue raised by the pleadings and evidence, it constitutes reversible error. *See Varme v. Gordon,* 881 S.W.2d 877, 881 (Tex.App.-Houston [14th Dist.] 1994, writ denied). Complaints regarding the trial court's charge are reviewed under an abuse of discretion standard. *Tex. Dep't*

3. Thedford does not challenge the trial court's take nothing judgment with regard to his claims against John A. Williams, III and WH Group, Inc. d/b/a East Texas Realty.

of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex.1990). An abuse of discretion occurs when the trial court acts without reference to any guiding principles. *Id.* An error in the charge is reversible only if harmful, that is, if it was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Akin v. Santa Clara Land Co.,* 34 S.W.3d 334, 345 (Tex.App.-San Antonio 2000, pet. denied). To determine whether an alleged error is harmful, we consider the pleadings, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986).

### Contractual Construction and Conditions Precedent

▮ In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.,* 907 S.W.2d 517, 520 (Tex.1995). To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id.; Myers v. Gulf Coast Minerals Mgmt. Corp.,* 361 S.W.2d 193, 196 (Tex.1962).

▮▮ If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe the contract as a matter of law. *Coker,* 650 S.W.2d at 393. The interpretation of an unambiguous contract is a question of law, which we review de novo. *See*

*MCI Telecommunications Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650 (Tex. 1999). Ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable. *Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 861 (Tex.2000).

▮ In interpreting a contract, we must presume that the parties thereto intended every clause to have some effect; therefore, we consider each part of the document with every other part of the document so that the effect and meaning of one part on any other part may be determined. *See Birnbaum v. SWEPI LP,* 48 S.W.3d 254, 257 (Tex.App.-San Antonio 2001, pet. denied). Moreover, we give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used such terms in a technical or different sense. *Id.* Finally, we enforce an unambiguous agreement as written. *Id.* We are not permitted to rewrite an agreement to mean something it did not. *Id.* We cannot change the contract simply because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it. *Id.* Parties to a contract are masters of their own choices and are entitled to select what terms and provisions to include in or omit from a contract. *Id.*

Here, while neither party argues that the contract is ambiguous, each interprets its language differently, and neither concedes that its interpretation of the relevant passage is any less reasonable than the other party's interpretation of the same. The epicenter of our inquiry is whether the parties' agreement concerning the location of the fifty acre tract was a condition precedent to Tew's obligation to close the sale. If the agreement was a condition precedent to Tew's obligation to close,

then it follows that Question 2 was properly conditioned on the jury's affirmative answer to Question 1.

To iterate, the contract stated, in pertinent part, as follows:

This option contract shall close on/or before November 15, 2005 or terminate with no further options or extensions. Seller and Purchaser have agreed to close one of two ways:

1. Payment of the original purchase price of $6,000,000 or

2. Purchaser, by notifying Seller by November 1, 2005, shall pay Seller $2,000,000 with mutual agreement to the following terms and conditions:

a. The total purchase price shall be raised to $10,000,000.

b. Seller shall release 50 contiguous acres to purchaser, such land to be mutually agreed upon.

c. Further releases to purchaser shall be at the rate of $1.00 per sq. ft. and shall be in 10 acre minimums.

d. The final closing date shall be extended to November 15, 2009 with any remaining balance due and payable by that date.

*Certainty of Essential Contract Terms and Agreement to Agree in the Future*

Tew argues that the trial court's conditional submission of the aforementioned questions in its charge is immaterial because paragraph (H)(2)(b) of the contract is an unenforceable agreement to agree, thus rendering the amended contract nugatory. Tew further argues that the contract omitted material terms rendering it indefinite and uncertain as to the parties' obligations.

 A contract must be sufficiently definite in its terms so that a court can understand what the promissor undertook. *T.O. Stanley Boot Co. v. Bank of El Paso,*

847 S.W.2d 218, 221 (Tex.1992). If an alleged agreement is so indefinite as to make it impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract. *Engelman Irrigation Dist. v. Shields Bros.,* 960 S.W.2d 343, 352 (Tex. App.-Corpus Christi 1997), *pet. denied per curiam,* 989 S.W.2d 360 (Tex.1998). In order for a court to enforce a contract, the parties must agree to the material terms of the contract. *T.O. Stanley Boot,* 847 S.W.2d at 221.

 Similarly, a contract providing for an agreement to be negotiated in the future is void. *See Ski River Dev., Inc. v. McCalla,* 167 S.W.3d 121, 133–34 (Tex. App.-Waco 2005, pet. denied). The parties, however, may agree on some terms sufficient to create a contract, leaving other provisions for later negotiation so long as those terms are not material or essential. *Id.* at 134. However, those terms left for future negotiation are not part of the enforceable portion of the contract. *See Killion v. Lanehart,* 154 S.W.3d 183, 189 (Tex.App.-Amarillo 2004, pet. denied).

 Here, the essence of the parties' agreement is the sale of real estate. The parties agreed that Tew would sell and Thedford would buy approximately 361 acres of land. The contract identified the location of the 361 acres to be conveyed, set forth the price Thedford would pay Tew, and stated the date on which the sale must close. Based on our reading of the contract, there is no uncertainty concerning these terms, and, thus, there exists a valid contract for the sale of 361 acres of real estate.

 The uncertainties Tew asserts in his brief do not serve to derail the greater purpose embodied in the parties' agreement—the sale of real estate. From our review of the contract as a whole, we

conclude that the terms concerning the location of land to be released to Thedford free of lien, though undoubtedly of concern to the parties, is not an essential term to the contract for sale of real estate. Thus, the parties' expression of this term as one to be agreed upon in the future does not serve to nullify the contract as a whole.

Likewise, the manner of release and extent of Tew's conveyance of the property between the closing of the option and the final closing date is not an essential term to the contract for sale of real estate. Thus, the parties' failure to specify such details is not fatal to their contract. Further still, the terms and provisions applicable to the payment of the balance of the purchase price are not essential terms to the overall sale of the property. *Cf. Penwell v. Barrett,* 724 S.W.2d 902, 905 (Tex.App.-San Antonio 1987, no writ) (Texas law does not require specific dollar figure be agreed to for contract to be enforceable; when agreement provides standard to be applied in determining price, contract is sufficiently definite to be enforceable). Thus, we conclude that while each of these details may be important to the parties and may have proven to be valuable additions to their agreement given the benefit of hindsight, the absence of such terms does not serve to render unenforceable the contract for sale.

*Existence of a Condition Precedent*

Conditions precedent to an obligation to perform under a contract are those acts or events occurring subsequent to the making of a contract that must occur before there is a right to immediate performance and before there is a breach of a contractual duty. *See Beacon Nat'l Ins. Co. v. Glaze,* 114 S.W.3d 1, 2 (Tex. App.-Tyler 2003, pet. denied) (citing *Hohenberg Bros. Co. v. George E. Gibbons &*

*Co.,* 537 S.W.2d 1, 3 (Tex.1976)). In order to determine whether a condition precedent exists, the intention of the parties must be ascertained by looking to the contract as a whole. *See Criswell v. European Crossroads Shopping Ctr., Ltd.,* 792 S.W.2d 945, 948 (Tex.1990). In construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible, when the intent of the parties is doubtful, or when a condition would impose an impossible or absurd result. *Criswell,* 792 S.W.2d at 948.

Thedford argues that the contract contains no language that would indicate the existence of a condition precedent. We agree that the contract contains no such language. However, while certain terms such as "if," "provided that," "on condition that," or some other phrase ordinarily connote the parties' intent that there be a condition precedent, no particular words are necessary for the existence of such a condition. *See Hohenberg Bros. Co.,* 537 S.W.2d at 3.

We have reviewed the contract in its entirety. We are mindful that conditions precedent are acts or events occurring subsequent to the making of a contract that must occur before there is a right to immediate performance. *See Glaze,* 114 S.W.3d at 2. Here, the contract sets forth that the parties agreed to close by one of two methods. There is no dispute on appeal that the method by which the parties agreed to close is embodied by paragraph (H)(2). From our reading of paragraph (H)(2) in light of the contract as a whole, it is apparent that the contract required the parties to mutually agree that, among other things, Tew would release fifty contiguous acres, the location of which would be agreed upon, to Thedford. However, the contract does not set forth any date by which the release of such property or the

determination of its location must occur. Rather, the contract required only that the parties *agree* that (1) Tew will release the land and (2) the parties would mutually agree upon the location of the land.

Tew contends that treating the provision as a covenant would lead to an absurd result. We disagree. Tew's argument rests upon his assertion that the parties imposed upon themselves a deadline of the closing date to agree upon the location of the fifty acre tract. However, as set forth above, a close reading of the contract reveals that no such deadline was expressed in the agreement. There is no indication from the plain language of the contract that the parties intended to compel the release of the fifty acre tract at the time of closing.

Therefore, based on the plain meaning of the language of the contract, we hold that the parties' mutual agreement concerning the location of the fifty contiguous acres to be released by Tew was a covenant rather than a condition. Thus, it follows that the trial court abused its discretion when it conditioned the jury's consideration of Question 2 on its affirmative response to Question 1. Thedford's first issue is sustained.

### Harm Analysis

■ Having sustained Thedford's first issue, we must determine if the error was harmful. As set forth above, an erroneous conditional submission constitutes reversible error if it deprives a party of the submission of an issue raised by the pleadings and evidence. *See Varme v. Gordon,* 881 S.W.2d 877, 881 (Tex.App.-Houston [14th Dist.] 1994, writ denied). By conditioning the jury's consideration of Question 2 on its affirmative response to Question 1, the trial court deprived Thedford the sub-

mission of Question 2. Thus, if the pleadings and evidence support the submission of Question 2, the trial court's erroneous conditional submission was harmful. *Id.; see also* TEX.R.APP. P. 44.1(a)(1).

As set forth previously, Question 2 stated as follows:

> Did TYLER ROSE NURSERY, INC. and JOE D. TEW fail to comply with a material obligation of their agreement with THEDFORD CROSSING, L.P. to sell and convey to THEDFORD CROSSING, L.P. the 361.917 [acre] tract of land located at I–20 and Jim Hogg Road in Smith County, Texas at the closing on November 15, 2005?

ANSWER YES OR NO

In the instant case, Thedford alleged in his third amended petition that Tew breached the parties' contract by, among other things, (1) failing and refusing to close the sale transaction at the closing on November 15, 2005 and (2) imposing additional terms not required by the contract or the addendum thereto with regard to future releases of property as a condition to closing the sale. There is evidence of record supporting that, on the date of closing, Tew did not convey the 361.917 acre tract of land in question to Thedford. Rather, the record reflects that Tew sought to induce Thedford to sign closing documents that included terms not embodied by the parties' contract. Thus, based on our review of the record, we conclude that the pleadings and evidence supported the submission of Question 2 to the jury. As such, we hold that the trial court's erroneous conditioning of Question 2 on an affirmative response to Question 1 caused Thedford harm.[4]

---

4. Because we have sustained Thedford's first issue and concluded that the trial court's er-

ror was harmful, we do not consider Thedford's second and third issues.

### DIRECTED VERDICT—FRAUD

In its fourth issue, Thedford contends that the trial court erred in granting a directed a verdict on its fraud claim.

### Standard of Review

In reviewing the grant of a directed verdict, an appellate court follows the standards for assessing the legal sufficiency of the evidence. *City of Keller v. Wilson,* 168 S.W.3d 802, 809–28 (Tex.2005); *see also Exxon Mobil Corp. v. Kinder Morgan Operating L.P. "A,"* 192 S.W.3d 120, 126 (Tex.App.-Houston [14th Dist.] 2006, no pet.). When reviewing a directed verdict, an appellate court must credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *City of Keller,* 168 S.W.3d at 827; *see also Cotten v. Weatherford Bancshares, Inc.,* 187 S.W.3d 687, 696 (Tex.App.-Fort Worth 2006, pet. denied). An appellate court must determine whether there is any evidence of probative force to raise a fact issue on the question presented. *See, e.g., Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004); *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994); *Sibai v. Wal-Mart Stores, Inc.,* 986 S.W.2d 702, 705 (Tex.App.-Dallas 1999, no pet.); *Edlund v. Bounds,* 842 S.W.2d 719, 723 (Tex.App.-Dallas 1992, writ denied).

A directed verdict is warranted when the evidence is such that no other verdict can be rendered and the moving party is entitled, as a matter of law, to a judgment. *See Edlund,* 842 S.W.2d at 724. A trial court may order a directed verdict in favor of a defendant when (1) a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery or (2) the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *See Prudential Ins. Co. of Am. v. Fin. Review*

*Servs., Inc.,* 29 S.W.3d 74, 77 (Tex.2000). A trial court may properly direct a verdict if no evidence of probative force raises a fact issue on the material questions in the lawsuit. *See Prudential Ins.,* 29 S.W.3d at 77; *Sibai,* 986 S.W.2d at 705. Moreover, the reviewing court may affirm a directed verdict even if the trial court's rationale for granting the directed verdict is erroneous, provided the directed verdict can be supported on another basis. *See Exxon Corp. v. Breezevale Ltd.,* 82 S.W.3d 429, 443 (Tex.App.-Dallas 2002, pet. denied).

However, it is error for a trial court to direct a verdict when a material issue is raised by the evidence. *See Edlund,* 842 S.W.2d at 724. If there is any conflicting evidence of probative value on any theory of recovery, a directed verdict is improper and the case must be remanded for the jury to determine that issue. *See Szczepanik,* 883 S.W.2d at 649; *Sibai,* 986 S.W.2d at 705; *Monroe v. Grider,* 884 S.W.2d 811, 815–16 (Tex.App.-Dallas 1994, writ denied). If reasonable minds could differ as to the controlling facts, a trial court errs if it grants a directed verdict and refuses to submit the issues to the jury. *See Latham v. Castillo,* 972 S.W.2d 66, 68 (Tex.1998); *Edlund,* 842 S.W.2d at 724.

### Governing Law

In order to determine the precise nature of Thedford's fraud claim, we must consider the factual allegations in Thedford's third amended petition. *See Murray v. O & A Express, Inc.,* 630 S.W.2d 633, 636 (Tex.1982) (plaintiffs petition defines issues in lawsuit). In its petition Thedford alleges, in pertinent part, as follows:

> [The Defendant's] actions described above constitute fraud with respect to the sale of the Property under Section

27.01 of the Texas Business & Commerce Code.

. . . .

[On] several occasions prior to the signing of the Addendum in August 2005, Defendants Tyler Rose Nursery and Joe Tew made false promises and representations to Plaintiff. Those promises included: (1) Defendants would close the sale transaction on or before November 15, 2005; (2) Defendants would adjust the final sales price in the amount of Sixteen Thousand dollars ($16,000.00) per acre as surveyed; (3) Defendants would pay [for] the title insurance policy; (4) Defendants would negotiate in good faith with regard to the identification of the fifty contiguous acres to be initially released to Thedford Crossing; and (5) Defendants would not seek to impose additional terms not discussed by the parties or required by the Contract or the Addendum, including imposing restrictions on future releases of property as a condition to closing the sale. Plaintiff relied on such representations, which were false, and has suffered damages as a result thereof.

Texas Business and Commerce Code, section 27.01 pertains to fraud in real estate transactions. Section 27.01 states, in pertinent part, as follows:

Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

. . . .

(2) false promise to do an act, when the false promise is

(A) material;

(B) made with the intention of not fulfilling it;

(C) made to a person for the purpose of inducing that person to enter into contract; and

(D) relied on by that person in entering into that contract

TEX. BUS. & COM.CODE ANN. § 27.01(a)(2) (Vernon 2009).

While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony. *Id.* Failure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made. *Id.* at 435. However, that fact is a circumstance to be considered with other facts to establish intent. *Id.* Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Id.* "Slight circumstantial evidence" of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent. *Id.* No pretense of performance by the defendant has been held to be a factor showing lack of intent. *See id.*

### Evidence Pertaining to Tew's Commission of Statutory Fraud

In the case at hand, Tew, by his contract with Thedford, made a promise that he would, among other things, close the sale of 361 acres of land to Thedford. The conveyance of the 361 acres was a material portion of the transaction. Furthermore, because the promise was ultimately not fulfilled, the promise could be logically construed as being a false one. Moreover, there is evidence of record that Thedford relied on Tew's promise to convey the 361 acres of land by securing the commitment of a financial partner, placing

$2,000,000 into escrow, and investing time and expense in preparation for closing the sale.

With regard to whether (1) Tew possessed intent not to fulfill his promise to Thedford and (2) Tew acted so as to induce Thedford to enter into the contract, we must consider what circumstantial evidence, if any, exists to support such elements. The most critical piece of evidence in this regard is Tew's testimony concerning his desire to never own property that was landlocked. Specifically, Tew testified as follows:

> Q Okay. Did you kind of have it in your mind an idea of how you wanted those releases to go?
> A Definitely.
> Q Was that something that you had decided on your own, or had someone else told you that's just how it had to be?
> A I really thought it was a matter of common sense. I often heard this stuff. And matter of fact, it had came [sic] up several years earlier.
> Where I live, the people that live behind me wanted an easement to the road, and they didn't have an easement that was—and I told them that I was more than glad to use my driveway.
> But those are the kind of things that you say why you want to make for certain you have access to property. I did not want anything landlocked. That was kind of one of the things that was in the back of my mind that was going on about that same time.

In sum, Tew's desire to avoid owning landlocked property was based on not only what he described as a matter of "common sense," but also his personal experience involving neighboring landowners becoming landlocked that had occurred "several years earlier." Thus, it reasonably follows that Tew's desire not to own landlocked

property existed at or before the time he signed the amendment.

The record further reveals that within days of signing the amendment, Tew hired an attorney, expressed his desire to her that he did not want the property to be landlocked, and that the attorney immediately began working on the issue of future releases of the property. Finally, the record reflects that Tew presented terms not embodied by the parties' contract, each of which concerned the future releases of property.

Tew entered into the amendment, which did not include restrictions on the location of property to be released in the future. A reasonable juror could further conclude that Thedford was more likely to enter into an agreement without terms restricting the future release of property than to enter into an agreement that included such terms. Moreover, a reasonable juror could conclude that Tew had no intent to fulfill his obligation to convey the property without Thedford's acceptance of his additional terms concerning the restriction of future releases given his longstanding aversion to ownership of landlocked property. It reasonably follows that Tew could use the actions and expense undertaken by Thedford between the time it signed the amendment and the November 15 closing as leverage to force Thedford to accede to his additional terms. It is equally logical to conclude that Thedford may not have been so inclined to agree to these restrictions had it not undertaken such additional effort and incurred such expense.

We conclude that the foregoing evidence meets the threshold required to support a jury submission on fraud pursuant to section 27.01. Thus, we hold that the trial court erred by granting a directed verdict against Thedford on its fraud claim. *See*

*Castillo,* 972 S.W.2d at 68. Thedford's fourth issue is sustained.

### DISPOSITION

We have sustained Thedford's first issue and, as a result, did not consider his second and third issues. We have further sustained Thedford's fourth issue. Having done so, we *reverse* the trial court's judgment, and *remand* the cause for a new trial.

GRIFFITH, J., dissenting.

I respectfully dissent.

I would affirm the judgment in the trial court, determining the location of the fifty acre plot is a condition precedent to the contract. However, the trial court erred in granting Tew's directed verdict on Thedford's fraud claim.

A condition precedent is "an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex.1992) (citing *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1 (Tex.1976)). The Texas Supreme Court defined "[c]onditions precedent to an obligation to perform [as] . . . those acts or events, which occur subsequently to the making of contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty." *Hohenberg Bros. Co.,* 537 S.W.2d at 3; RESTATEMENT OF CONTRACTS § 250 (1932).

This court's opinion states that the "essence of the parties' agreement is the sale of real estate." And that was true with the original contract, as well as section (H)(1) of the amended contract. Both the original agreement between Thedford and Tew and the steps to execute section (H)(1) of the amended contract were very

straightforward: Thedford Crossing, L.P., was to pay Tyler Rose Nursery, Inc. and Joe Tew $6,000,000 for the purchase of the entire 361 acres of land. In such an agreement, where the land is clearly identified, and the amount to be paid is stated, on the date of the closing the buyer gives the seller the agreed purchase price, and the seller executes the necessary documents to effectuate the transfer of land's title to the buyer.

However, as is found in the August 2005 amended contract, under section (H)(2), the provision under which Thedford and Tew proceeded, where there is not a direct money-for-deed exchange but rather, a pay-out and a release of various portions of the 361 acres in stages over a number of years, there are other considerations to be addressed.

Indeed, both Thedford and Tew recognized that, with the piecemeal sale of such a large tract of land over four years, some land is far more valuable than other portions of the land in the initial stages of the land's parsed out sale and development. For instance, road frontage property could be perceived as being more beneficial for the buyer to acquire first, with which to both begin development and, perhaps, to fund the later purchases. One could assume that the more highly desired land would be situated somewhere along one or at the nexus of both of the two main highways that fronted the property, Interstate 20 and U.S. Highway 69.

By the explicit terms of the August 2005 amended contract, Thedford and Tew did recognize that the location of the initial fifty acres of land to be released would be critical to the implementation of the contract to which they were agreeing, specifically stated that the placement and determination of the exact parameters of that parcel of land would have to be "mutually agreed upon" by both Thedford and Tew.

By that provision, the two parties made that contract term essential, requiring the resolution of the exact location of the land before the parties could proceed with the sale. Thedford and Tew both viewed the issue of the location and shape of the initial fifty acres as so critical to the contract that, despite the omission of numerous other seemingly important conditions to the sale, this condition, the location of that fifty acres, was the only term of the contract that specifically required mutual agreement between the two parties before the release of the initial fifty acres to Thedford.

The two parties having contracted that they had to mutually agree to the location of that initial fifty acres of land rendered that term a condition precedent. Therefore, I would uphold the trial court's jury charge instruction providing for a conditional response to Jury Question 2, and would affirm the judgment on that issue.

However, there was some conflicting evidence regarding Thedford's fraud claim. Because Thedford did adduce some evidence which raised a fact issue, the trial court erred in granting a directed verdict on the issue of Thedford's fraud claim. Therefore, I would reverse on that issue.