Brown, J., dissenting.
DISSENTING OPINION
Harvey Brown, Justice
These parties negotiated and executed a contract with a force majeure provision for suspending contractual obligations during a period in which a party's performance is "prevented or hindered." The contract does not say that an event must have been unforeseeable to suspend performance; nonetheless, one of the parties, ConocoPhillips, has argued that such a limitation should be read into the contract because, at common law, the term "force majeure" included the notion of unforeseeability. ConocoPhillips reads our Court's 1987 decision in Valero Transmission Co. v. Mitchell Energy Corp. to support this interpretation.[1] The Court agrees and, in doing so, reads a term into a contract that simply is not there.
I dissent because the Texas Supreme Court has repeatedly told us that it is this state's policy to enforce contracts as they are written.[2] Contracting parties are the masters of their agreement.[3] They should be able to rely on their negotiated terms to mean what they say. We are not to imply terms into an agreement.[4] If a party wants a term in a contract, the party should write it.[5] These frequent admonitions require that we decline a litigant's post-hoc invitation to inject unstated contract terms into parties' agreements and that we read Valero narrowly because a contrary interpretation *190 does what we are otherwise told not to do-imply a term into a contract that the parties chose not to include.
Texas contract-interpretation law requires parties to include in their contracts those terms they desire and courts to interpret their contracts as written. When we start inserting unwritten terms into contracts, inconsistent holdings result. Legal commentators are left to try to reconcile our holdings to understand when terms might be added in similar or distinguishable contexts. In the area of force majeure and foreseeability, this has led some commentators to theorize that case holdings can be reconciled by focusing on the type of contract and whether a particular risk was allocated such that it cannot qualify as a force majeure,[6] while others look for a pattern by focusing on whether the event was enumerated or fell within the "catch-all" clause and conclude that unforeseeability is frequently imputed in one class but not the other.[7] Such uncertainty in the law should be avoided,[8] and can be, by doing as the Texas Supreme Court has instructed us to do for decades: "We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained."[9]
Following this mandate achieves consistency without burden. If parties wish to limit the scope of their negotiated force majeure provisions to require that an event must have been unforeseeable to excuse performance, it is not difficult to insert that single adjective into their written agreements so that their contracts say what the parties intended.[10] The result is obtainable through standard contract negotiation, without the need to rely on common law definitions or imputed terms.
Because the Court takes an approach counter to established contract-interpretation rules and engrafts a term not found in the parties' contract, I respectfully dissent.
The Parties' Force Majeure Provision
The parties' contract is a farmout agreement. "A farmout agreement is an assignment *191 by a lease owner of all or a portion of the lease to another operator who desires to drill on the tract."[11] The primary characteristic of a farmout is the farmee's obligation to drill one or more wells on the farmor's leased land as a prerequisite to completion of the transfer.[12]
The parties' farmout agreement contains an excused delay provision, which the parties' termed a "force majeure" clause. Article 31 provides as follows:
FORCE MAJEURE
Should either Party be prevented or hindered from complying with any obligation created under this Agreement, other than the obligation to pay money, by reason of fire, flood, storm, act of God, governmental authority, labor disputes, war or any other cause not enumerated herein but which is beyond the reasonable control of the Party whose performance is affected , then the performance of any such obligation is suspended during the period of, and only to the extent of, such prevention or hindrance, provided the affected Party exercises all reasonable diligence to remove the cause of force majeure. The requirement that any force majeure be remedied with all reasonable diligence does not require the settlement of strikes, lockouts or other labor difficulties by the Party involved.
(Emphasis added.) Thus, the parties included within the force majeure protections of their contract "any" cause that "prevented or hindered" contract compliance that is "beyond the reasonable control of the Party whose performance is affected." They did not include any language requiring that an event be unforeseeable to qualify as a force majeure event.
General Principles of Contract Interpretation
In construing a written contract, the primary concern is to ascertain and give effect to the parties' intentions as expressed in the document.[13] "Objective manifestations of intent control, not 'what one side or the other alleges they intended to say but did not.' "[14] Courts " 'presume parties intend what the words of their contract say' and interpret contract language according to its 'plain, ordinary, and generally accepted meaning' unless the instrument directs otherwise."[15]
If under these rules a contract can be given a certain or definite legal meaning or interpretation, then it is unambiguous.[16] Courts must enforce an unambiguous contract as written and may not consider extrinsic evidence to give a contract a meaning different from that which its language imports or for the purpose of creating an ambiguity.[17]
*192 Contracts sometimes include terms that have common law significance, and a contract-interpretation issue can arise regarding whether the common law can inform the meaning of the contractual terms. Contract-interpretation rules require that contracting parties' intent be determined based on the language included in their contract, not by reference to "definitions not expressed in the parties' written agreements."[18] Thus, "the scope and application of a force majeure clause"-or any contract-"depend on the terms of the contract," and not on the common law meanings of terms or their "historical underpinnings."[19]
Objective, extrinsic evidence of "facts and circumstances" may provide context to the transaction, though.[20] For example, trade custom can bear on the parties' objective intent and illuminate the meaning of contract language.[21] But there are limits:
Parties cannot rely on extrinsic evidence to "give the contract a meaning different from that which its language imports," "add to, alter, or contradict" the terms contained within the agreement itself, "make the language say what it unambiguously does not say," or "show that the parties probably meant, or could have meant, something other than what their agreement stated."[22]
In short, "we may neither rewrite the parties' contract nor add to its language."[23] This applies equally to force majeure clauses as to other contract provisions.[24]
We also must not read a force majeure section or phrase within it in isolation; the contract must be read as a whole.[25] Therefore, when a force majeure clause does not explicitly include a requirement that an event be unforeseeable to trigger force majeure protections, we should not read such a requirement into the parties' agreement absent other evidence from the contract itself indicating that the parties intended to require that an event be unforeseeable to qualify as a force majeure event.[26]
*193 We simply cannot change a contract "because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it."[27] Instead, we must honor the parties' agreed terms and provisions-including what they choose to omit from their contract-because the contracting parties "are masters of their own choices."[28] Neither party should be left to speculate about the undisclosed subjective intent of the other or wonder if the silent hand of the common law might reach into their agreement and alter its terms.
Force Majeure as a Theory and a Contract Term
The term "force majeure" dates back more than a century.[29] "Generally speaking, the term 'force majeure' refers to an event, such as an 'Act of God,' beyond the parties' reasonable control that intervenes to create a contractual impossibility and thereby excuse contract performance."[30] But much of the "historical underpinnings" of the doctrine "have fallen by the wayside."[31] Today, force majeure is "little more than a descriptive phrase without much inherent substance. Indeed, its scope and application, for the most part, is utterly dependent upon the terms of the contract in which it appears."[32]
Case law reveals that parties generally choose to excuse delayed performance for events that are (1) beyond a party's reasonable control, (2) unforeseeable, or (3) both.[33] Contracting parties are free to negotiate any of these choices to fit their particular circumstances and to add other terms, such as requiring diligence to overcome a qualifying event, just as they are with other contract provisions.[34] Courts should honor these choices.
*194 Because parties define the scope of their force majeure provisions to excuse performance in light of their transaction's realities and its acceptable and unacceptable risks, reviewing courts cannot myopically scrutinize the contract's single force majeure provision to identify a qualifying event; instead, they view the entire contract to determine whether the parties intended the disruptive event to be within the body of risk assigned to a party or if, instead, it may excuse performance through the force majeure provision.[35] Textual indications that the parties intended that a type of event not excuse performance could include either specific contract provisions indicating that the parties intended a contingency to be an assigned risk and, therefore, incapable of qualifying as a force majeure or, more globally, consideration of the general nature of the agreement indicating that such a contingency was not intended to excuse performance.[36] Viewing the entire agreement to discern intent is consistent with common contract principles applied in other contract disputes.[37]
Valero Is Consistent with This Approach
ConocoPhillips argues that Valero requires that we imply a requirement of unforeseeability into the parties' contract even if it is not expressly included within the force majeure provision. I disagree that Valero requires the engrafting of an unstated term into these parties' contract. That opinion, instead, does what contract-interpretation principles dictate, which is to consider the nature of the parties' contract and its language as a whole to determine whether the claimed force majeure was part of the assigned risk such that it could not qualify as a force majeure event.[38]
In Valero , a natural gas pipeline company, Valero, unsuccessfully sought to be excused from its contractual obligation to purchase gas by arguing that a significant downturn in the natural gas market qualified as an event "beyond its reasonable control" to invoke force majeure protections under its fixed-price supply agreement *195 with the natural gas producer.[39] In rejecting the pipeline company's contention, this Court observed that the "primary purpose of a price agreement is to fix the price and consequently to avoid the risk of price fluctuation."[40] Based on the nature of the contract-a fixed-price agreement-"a sudden or significant change in price, or the fact that one of the parties may gain or lose during a particular period of the contract, is not sufficient to constitute an extraordinary, unforeseeable event that would excuse performance under the force majeure clause."[41] This Court rejected Valero's argument that a price fluctuation fell within the force majeure provision's protections, citing two cases that also involved fixed-price and warranty-type contracts.[42] It held, instead, based on the nature of the contract and the language taken as a whole, that a change in market conditions could not qualify as a force majeure event under the parties' fixed-price contract.[43]
Valero is consistent with standard contract-interpretation principles, including that contracts be analyzed as a whole and in a way that does not leave some aspects of the agreements meaningless.[44] In the context of a fixed-price contract, the obligation to provide a product at a fixed price would be meaningless if price were an excuse for nonperformance.[45] Sudden changes in price that greatly outpace projected risk cannot qualify as a force majeure event to excuse performance because it would be antithetical to the very nature of a price-fix agreement for a party that contracted to purchase gas at a fixed price to argue that a change in market pricing qualified as a force majeure event.[46] A change is price is the anticipated event-the contingency-for which the parties assigned risk in their contract.
The Third Circuit's holding in Gulf Oil , which was cited in Valero , is similar. In Gulf Oil , the court construed a warranty contract that contained a force majeure clause.[47] The gas supplier warranted that it could supply a certain amount of gas daily.[48] The contract did not limit the supplier's obligation to a single source of gas; the gas could be supplied from any available source.[49] The contract contained a force majeure clause to excuse nonperformance if a party was rendered unable to meet its contract obligations and defined force majeure to mean "acts of God" and "any other causes ... not within the control of the party" that is seeking to be excused.[50] But it excluded from its force majeure protections the "partial or entire failure or depletion of gas reserves or sources of supply of gas."[51] The supplier invoked the force majeure clause to reduce its supply obligations based on routine maintenance delays that prevented use of pipelines near its main supply source, asserting that mechanical breakdowns are *196 outside its control.[52] Yet the supplier had a second source of gas available: its own reserves.[53]
Giving consideration to the parties' entire contract, and not limiting itself to the force majeure provision in isolation, the Third Circuit rejected the supplier's argument.[54] The court noted that the supplier had warranted that it would have a specific quantity of gas available daily without specifying the source of its supply.[55] Thus, the supplier had to look to its reserve source if an event disrupted production from its main supply source.[56] A disruption with only the main supply source would not prevent supply from the reserve source to truly prevent compliance with the warranty contract.[57] Given the warranty nature of the parties' agreement-guaranteeing adequate supply of gas-a failure to meet the daily delivery obligations could be excused only if the disruption impacted both the regular and the reserve fields such that all sources were unusable.[58]
The Third Circuit repeatedly emphasized that its holding was based on the warranty nature of the supply contract and the absence of any contractual limitation on the source of gas to be supplied.[59] To qualify as a force majeure event within a warranty contract, there must be an "element of uncertainty or lack of anticipation" surrounding the event's occurrence, and the event "must affect the availability and the delivery of gas" to excuse compliance with the contract that warrants a certain supply.[60] It would be antithetical to the supply contract's warranty nature to allow routine mechanical repairs at one supply source to qualify as a force majeure and excuse a failure to deliver warranted amounts of gas.[61] By warrantying (guaranteeing) a supply of a certain quantity of gas, the supplier contracted to accept the risk of everyday obstacles to delivery.[62]
*197 These cases discuss foreseeability in the context of the parties' contractual obligations. Under Valero , when a party enters into a supply contract in which it agrees to supply a good at a fixed price, price fluctuation is the anticipated event for which the parties are assigning risk.[63] The very risk that the contract contemplates is that the price will change. Thus, the contemplated and anticipated risk of a change in market price cannot be the event that the parties intend to be covered by a force majeure provision.[64] Instead, the risks have to be something else, something other than the very thing the parties contracted about and assigned risk for.[65] Under Gulf Oil , the same is true for a contract that guarantees a quantity of a good: the risk falls on the guarantor to supply that quantity, and neither routine obstacles nor partial hindrances will excuse performance.[66]
In my view, interpretation of the force majeure provisions in Valero and Gulf Oil was tied to the contracts' warranty nature. To the extent the cases discuss foreseeability, it is in the context of analyzing, first, whether the disrupting event that one party sought to qualify as a force majeure was actually the contingency contemplated by the parties when they assigned risk, and, second, whether the nature of the contract was such that broader contractual obligations prevent this type of event from excusing performance. The foreseeability analysis was a practical evaluation of the parties' agreement as a whole to determine whether the identified event was within the contract's assignment of risk such that the risk could not qualify as a force majeure.[67]
The foreseeability analysis was not, as ConocoPhillips contends and the Court holds, a pronouncement that common law doctrinal aspects of force majeure engraft a general unforeseeability requirement into force majeure agreements (or at least the catch-all clause of the force majeure provision) even without contract language to support such a requirement.[68] Such a *198 pronouncement violates well-established rules of contract interpretation that require us to determine the parties' intent through the language they chose to incorporate into their unambiguous agreements.
ConocoPhillips Failed to Meet Its Summary Judgment Burden to Disprove, As a Matter of Law, TEC's Affirmative Defense of Force Majeure
ConocoPhillips brought a breach-of-contract claim against TEC and sought liquidated damages. ConocoPhillips moved for and prevailed on its summary-judgment motion, arguing that it established all elements of its breach-of-contract claim and, along with it, disproved TEC's affirmative defense of excused-delay protections as a matter of law.
To defeat ConocoPhillips's motion for summary judgment, TEC was required to bring forth evidence sufficient to raise a genuine issue of material fact on its force majeure affirmative defense.[69] TEC was not required to prove its affirmative defense as a matter of law; raising a material fact issue is sufficient to defeat summary judgment.[70]
In my view, summary judgment in ConocoPhillips's favor on the inapplicability of the force majeure provision was error for three related reasons. First, as discussed above, the force majeure provision does not explicitly include an unforeseeability requirement to invoke its protections, and the established rules of contract-interpretation do not support adding to the parties' contract such a term they did not include.
Second, the force majeure provision, when read in light of the general understanding of the terms the parties did choose to include, is unambiguous in the scope of its excused-delay protections. It excuses delay when a party has been "prevented or hindered" from performing either "by reason of fire, flood, storm, act of God, governmental authority, labor disputes, [and] war" or "any other cause not enumerated herein but which is beyond the reasonable control of the Party whose performance is affected." The former includes particular events; the latter is broader, but is not without its own limits because the parties restricted other cause to only causes that are "beyond the reasonable control" of the party. These terms contain no ambiguity.[71]
*199 Third, the contract as a whole, giving consideration to all its terms, does not contradict this interpretation. Under their agreement, TEC was to commence drilling operations on an earning well within 180 days. A time period of 180 days to perform is not a lengthy time, which might suggest that the parties'-or at least ConocoPhillips's-interest was in timely performance regardless of obstacle or impediment. But ConocoPhillips placed limits on its ability to terminate the contract and collect liquidated damages when it added a provision that would allow TEC to "suspend" the contract during a period of delay if TEC became "hindered."
ConocoPhillips elected to set the standard of "hindered" for the qualifying obstacle. Dictionary definitions of hinder include "to keep back; restrain; get in the way of; prevent; stop" and "to make difficult for; thwart; impede; frustrate."[72] The word hinder suggests a low threshold before the force majeure clause applies. The party does not have to be prevented from performing, only hindered.[73]
Moreover, during the period of hindrance, the contract is not terminated; instead, it is "suspended" until the hindrance is lifted. The parties' election to allow the contract to be suspended, which in effect extended their obligations, also suggests a low threshold before the clause applies. Parties may choose to include excused-delay provisions, like this, because of the varying effect of a failure to perform. Typically, when a party fails to act under a contract, the party is in breach, and the other party is excused from further performance.[74] When an excused-delay provision is included in the contract, though, the contract does not terminate; instead, it is "suspended during the period of, and only to the extent of, such prevention or hindrance."[75] This allows the parties an alternative path to breach-and-termination that will maintain the relationship despite the *200 obstacle.[76] By including the possibility of suspension of a contract that had such a short time period for performance, these parties have indicated that they place at least equal weight on other variables beyond the timeliness of performance. I note this because the excused-performance provision does not simply negate the obligation to pay liquidated damages; it delays performance until the hindrance is lifted, thereby extending the contract and maintaining the relationship and the duties of the parties.[77]
In conclusion, there is no evidence from the terms of the remainder of the parties' agreement or the nature of the agreement itself to support injecting an otherwise unagreed-to term into their agreement. On the contrary, the combination of both low thresholds counsels against interpreting the parties' agreement to require a higher standard of unforeseeability.
Conclusion
The trial court and this Court accept ConocoPhillips's argument that TEC could not avail itself of the force majeure clause as a matter of law because the clause silently, but by implication, incorporated the common law requirement that a force majeure event be unforeseeable. I disagree for three reasons. First, the court's injection of additional terms is inconsistent with well-established Texas contract-interpretation rules. Second, the use of the word hinder in the force majeure clause and the parties' decision that the excuse applies not only to terminate a party's performance obligation but to suspend it suggests that the parties did not agree to a narrow and restrictive unforeseeability requirement. Third, the general nature of this contract is very different from the warranty contracts on which ConocoPhillips relies. Therefore, I respectfully dissent.

743 S.W.2d 658, 663 (Tex. App.-Houston [1st Dist.] 1987, no writ).

In re Davenport , 522 S.W.3d 452, 457 (Tex. 2017) ("We cannot make new contracts between the parties and must enforce the contract as written."); Royal Indem. Co. v. Marshall , 388 S.W.2d 176, 181 (Tex. 1965).

Thedford Crossing, L.P. v. Tyler Rose Nursery, Inc. , 306 S.W.3d 860, 867 (Tex. App.-Tyler 2010, pet. denied).

See Am. Mfrs. Mut. Ins. Co. v. Schaefer , 124 S.W.3d 154, 162 (Tex. 2003) ; Marshall , 388 S.W.2d at 181.

See Sonat Expl. Co. v. Cudd Pressure Control, Inc. , 271 S.W.3d 228, 232 (Tex. 2008) (in discussing choice-of-law provisions, stating that parties may choose contract provisions, but "must make that choice themselves").

See Robert N. Barnes & Randall J. Wood, The Allocation of Risk in Gas Purchase Contracts after Golsen v. ONG Western, Inc., 13 Okla. City U. L. Rev. 503, 535 (1988) ("The allocation of risk between the parties, as governed by the principal intent and purpose of the entire contract, is the court's truest guide to properly resolving the many excuses for nonperformance presented in take-or-pay litigation today."); infra pp. 194-95.

See Jay D. Kelley, So What's Your Excuse? An Analysis of Force Majeure Claims , 2 Tex. J. Oil Gas & Energy L. 91 (2007) ; Majority Op. pp. 182-85; see also Jocelyn L. Knoll & Shannon L. Bjorklund, Force Majeure and Climate Change What is the New Normal? , 8 J. Am. C. Constr. Law. 2, at Sec. III.C.1. (2014); Anthony A. Zoobkoff, Force Majeure (and Other Useful French Profanities) in Resource Agreements , 59 RMMFL-INST 17-1, at § 17.04(3)(b) (2013).

See Sonat Expl. , 271 S.W.3d at 235 ("Enforcing contracts according to their own terms satisfies the relevant policies of the forum, enhances certainty, predictability, and uniformity of result, and facilitates commerce and relations with other states and nations.") (footnotes omitted); Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc. , 246 S.W.3d 42, 51 (Tex. 2008) (observing that rewriting parties' contract would take step back from predictability in law relating to business transactions in Texas).

Tenneco Inc. v. Enter. Prods. Co. , 925 S.W.2d 640, 646 (Tex. 1996).

One legal writer suggests this phrasing to include an unforeseeability requirement in a force majeure "catch all" clause: "any other cause beyond the unit operator's reasonable ability to foresee or control." See Allison R. Ebands, Comment, Force Majeure: How Lessees Can Save Their Leases While the War on Fracking Pages On , 48 St. Mary's L.J. 857, 887 (2017).

ExxonMobil Corp. v. Valence Operating Co. , 174 S.W.3d 303, 313 (Tex. App.-Houston [1st Dist.] 2005, pet. denied) ; see Howard R. Williams & Charles J. Meyers , Oil & Gas Terms 211 (4th ed. 1976).

Id.

URI, Inc. v. Kleberg Cty. , 543 S.W.3d 755, 763-64 (Tex. 2018) ; Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am. , 341 S.W.3d 323, 333 (Tex. 2011).

URI , 543 S.W.3d at 763-64 (quoting Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London , 327 S.W.3d 118, 127 (Tex. 2010) ).

Id. (quoting Gilbert , 327 S.W.3d at 126 ); see Valence Operating Co. v. Dorsett , 164 S.W.3d 656, 662 (Tex. 2005).

Frost Nat'l Bank v. L & F Distribs., Ltd. , 165 S.W.3d 310, 312 (Tex. 2005).

David J. Sacks, P.C. v. Haden , 266 S.W.3d 447, 450 (Tex. 2008).

See Provident Life & Acc. Ins. Co. v. Knott , 128 S.W.3d 211, 219 (Tex. 2003).

Zurich Am. Ins. Co. v. Hunt Petrol. (AEC), Inc. , 157 S.W.3d 462, 466 (Tex. App.-Houston [14th Dist.] 2004, no pet.).

See URI , 543 S.W.3d at 763-64, 766-68.

Id. at 766-69.

Id. at 769 (internal footnotes and citations omitted).

Schaefer , 124 S.W.3d at 162.

See, e.g. , Roland Oil Co. v. R.R. Comm'n of Tex. , No. 03-12-00247, 2015 WL 870232, at *5 (Tex. App.-Austin Feb. 27, 2015, pet. denied) (mem. op.) (stating that "the scope and effect of a force majeure clause depend ultimately on the specific language used in the contract"); Zurich , 157 S.W.3d at 466 ("Regardless of its historical underpinnings, the scope and application of a force majeure clause depend on the terms of the contract."); Sun Operating Ltd. P'ship v. Holt , 984 S.W.2d 277, 282-83 (Tex. App.-Amarillo 1998, pet. denied) (stating that, "when the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure."); cf. Kodiak 1981 Drilling P'ship v. Delhi Gas Pipeline Corp. , 736 S.W.2d 715, 720-21 (Tex. App.-San Antonio 1987, writ ref'd n.r.e.) (stating that "it is not for the reviewing court to determine why parties contracted as they did").

See Nassar v. Liberty Mut. Fire Ins. Co. , 508 S.W.3d 254, 258 (Tex. 2017) ; Hysaw v. Dawkins , 483 S.W.3d 1, 16 (Tex. 2016).

See Sun Operating , 984 S.W.2d at 288 n.4 (stating that "to imply an unforeseeability requirement into a force majeure clause would be unreasonable"); Kodiak , 736 S.W.2d at 720-21 (rejecting argument that unforeseeability was inherent aspect of force majeure clauses); see also Roland , 2015 WL 870232, at *5-6 (rejecting argument that common-law aspects of force majeure doctrine apply absent text including them); cf. Perlman v. Pioneer Ltd. P'ship , 918 F.2d 1244, 1248 & n.5 (5th Cir. 1990) (stating that, because contract did not mandate that force majeure event be unforeseeable, "district court erred when it supplied those terms as a rule of law"); Sabine Corp. v. ONG W., Inc. , 725 F.Supp. 1157, 1170 (W.D. Okla. 1989) (refusing to incorporate unforeseeability requirement into force majeure provision that did not expressly include such requirement).

Thedford Crossing , 306 S.W.3d at 867.

Id.

Force majeure , Black's Law Dictionary (10th ed. 2014).

Va. Power Energy Mktg., Inc. v. Apache Corp. , 297 S.W.3d 397, 400 n.3 (Tex. App.-Houston [14th Dist.] 2009, pet. denied) (citing Perlman , 918 F.2d at 1248 n.5 and Black's Law Dictionary 645 (6th ed. 1990) ) (emphasis omitted). Some of the cited materials have italicized the term "force majeure," others have not. For consistency, the term will be unitalicized throughout this opinion. See Bryan A. Garner , The Redbook: A Manual on Legal Style 80 (3d ed. 2013) (noting that foreign terms that have become "anglicized" no longer require italicization).

Sun Operating , 984 S.W.2d at 283.

Id.

See, e.g. , Hydrocarbon Mgmt., Inc. v. Tracker Expl., Inc. , 861 S.W.2d 427, 436 (Tex. App.-Amarillo 1993, no writ) (stating that force majeure clauses excuse performance "when the non-performance is caused by circumstances beyond the reasonable control of [the party] ... or when non-performance is caused by an event which is unforeseeable at the time the parties entered the contract."); Roland , 2015 WL 870232, at *5 (construing force majeure clause that excused performance for "causes beyond reasonable control of the party"); United States v. Brooks-Callaway Co. , 318 U.S. 120, 121 & n.1, 63 S.Ct. 474, 87 L.Ed. 653 (1943) (construing force majeure clause that excused performance for any "unforeseeable causes beyond the control ... of the contractor").

See Roland , 2015 WL 870232, at *5 (stating that "scope and effect of a force majeure clause depend ultimately on the specific language used in the contract and not on any traditional definition of the term ....").

See Valero , 743 S.W.2d at 663 (analyzing force majeure provision in light of price-fix nature of parties' agreement and noting that "primary purpose of a price agreement is to fix the price and consequently to avoid the risk of price fluctuation" to then conclude market price changes will not qualify as force majeure in price-fix agreement); Roland , 2015 WL 870232, at *5 (analyzing force majeure applicability by considering parties' agreement "as a whole and taking its words in context"); Gulf Oil , 706 F.2d at 452 (considering full import of parties' agreement and stating, "Force majeure events within a warranty contract can excuse the supplier's nonperformance ... only to the extent that the supplier has shown that it had available resources to meet its warranty obligation."); see also Knott , 128 S.W.3d at 220 (stating that judiciary's role "is not to redistribute these risks and benefits" that parties have assigned "but to enforce the allocation that the parties previously agreed upon.").

See Valero , 743 S.W.2d at 663 (considering that agreement being analyzed was price-fix agreement and noting that "primary purpose of a price agreement is to fix the price and consequently to avoid the risk of price fluctuation," concluding that market price changes cannot qualify as force majeure).

See, e.g. , Nassar , 508 S.W.3d at 258 ("No one phrase, sentence, or section of a contract should be isolated from its setting and considered apart from the other provisions.") (quoting, in part, Forbau v. Aetna Life Ins. Co. , 876 S.W.2d 132, 134 (Tex. 1994) ); Hysaw , 483 S.W.3d at 16 ("Intent must be determined by a careful and detailed examination of the document in its entirety, rather than by application of mechanical rules of construction that offer certainty at the expense of effectuating intent.").

See Valero , 743 S.W.2d at 663-64.

Id. at 661-63.

Id. at 663-64.

Id.

Id. at 663 (citing Gulf Oil , 706 F.2d at 452 and Mainline Inv. Corp. v. Gaines , 407 F.Supp. 423, 427 (N.D. Tex. 1976) ).

Valero , 743 S.W.2d at 664.

See ids="11290897" index="140" url="https://cite.case.law/sw2d/743/658/#p660">id. at 663-64 ; see also Gulf Oil , 706 F.2d at 452.

Valero , 743 S.W.2d at 663.

See ids="11290897" index="143" url="https://cite.case.law/sw2d/743/658/#p660">id. at 663-64.

706 F.2d at 444.

Id. at 452.

Id.

Id. at 448 n.8.

Id.

Id. at 450.

Id. at 452.

Id. at 453.

Id. at 452.

Id.

See id.

Id. at 453.

See id. at 453-55.

Id. at 453.

Id. at 454.

The Third Circuit discusses foreseeability in two parts of its Gulf Oil opinion. It does so, first, while highlighting that the agreement's context-a warranty contract-largely informs its analysis. Id. at 452. The court stated, "We were referred to no cases in which a force majeure clause was decided within a warranty contract context." Id. The court then stated, in dicta, "However, it is well settled that a force majeure clause in a non-warranty contract defines the area of unforeseeable events that might excuse nonperformance within the contract period." Id. In support of this statement, the court cited a Supreme Court case analyzing a force majeure clause that defined force majeure events as "unforeseeable causes beyond the control" of the contracting party. See id. (citing Brooks-Callaway , 318 U.S. at 121 n.1, 123-24, 63 S.Ct. 474 (emphasis added) ). The contract in Brooks-Callaway , from which Gulf Oil noted an unforeseeability requirement, expressly required that a force majeure event be unforeseeable. That makes Brooks-Callaway and the statement in Gulf Oil distinguishable from the facts here.
Gulf Oil discusses foreseeability a second time when considering whether routine maintenance can qualify as a force majeure event under the warranty contract. Id. at 453-54. It concludes that it would be contrary to the warranty nature of the parties' contract to allow "frequent," "routine" "mechanical breakdowns" that happen with "regularity" to excuse performance. Id. Promising to maintain a supply of product includes a commitment to overcome routine obstacles to meeting demand. See id. The court analyzed whether an event could qualify as a force majeure not in terms of whether it was a foreseeable event in the abstract but, instead, in light of the nature of the parties' agreement and the contract's other terms, to discern whether the parties assigned risk related to such an occurrence. See id. ; see also Valero , 743 S.W.2d at 663 (analyzing force majeure provision in light of price-fix nature of parties' agreement). Given the nature of the parties' agreement, the court concluded that the parties had assigned risk for routine maintenance needs. See Gulf Oil , 706 F.2d at 454.

The supplier assumes the risk that an increase in market prices will harm him while, at the same time, he accepts the benefit that will inure to him if market prices fall. See Valero , 743 S.W.2d at 663.

See ids="11290897" index="168" url="https://cite.case.law/sw2d/743/658/#p660">id.

See ids="11290897" index="169" url="https://cite.case.law/sw2d/743/658/#p660">id.

See Gulf Oil , 706 F.2d at 454.

Cf. Knott , 128 S.W.3d at 220 (stating that judiciary's role "is not to redistribute these risks and benefits" that parties have assigned "but to enforce the allocation that the parties previously agreed upon.").

ConocoPhillips cites Roland as support for its proposition that "courts may consider traditional concepts of force majeure, such as unforeseeability and control, when interpreting a catch-all provision in a force majeure clause," even if those requirements are not inherent to specifically listed force majeure events. ConocoPhillips's reliance on Roland is misplaced. But the Roland court expressly rejected the idea that common-law aspects of the force majeure doctrine govern the applicability of the force majeure provision absent supporting contract terms. Roland , 2015 WL 870232, at *5. Relying on Zurich , Sun Operating , and Perlman , the court stated, "[W]e agree ... that the scope and effect of a force majeure clause depend ultimately on the specific language used in the contract and not on any traditional definition of the term." Id. at *5 & nn.24, 31 (emphasis added). The court held that the force majeure provision challenged in that case incorporated the historical requirement that a force majeure event must be beyond the reasonable control of the party; but it did so, not because that was a historical aspect of the doctrine, but, because "the language used in the clause itself" incorporated the requirement. Id. at *5. The contract explicitly described a qualifying force majeure event as "any other cause or causes beyond the reasonable control of the party." Id.

See Brownlee v. Brownlee , 665 S.W.2d 111, 112 (Tex. 1984) ; Anglo-Dutch Petrol. Int'l, Inc. v. Haskell , 193 S.W.3d 87, 95 (Tex. App.-Houston [1st Dist.] 2006, pet. denied).

See Brownlee , 665 S.W.2d at 112 ; Anglo-Dutch Petrol. , 193 S.W.3d at 95.

The Court agrees that the parties' contract is unambiguous. When a contract is unambiguous, background contract interpretation aids, like the doctrine of ejusdem genris, do not apply. Hussong v. Schwan's Sales Enters., Inc. , 896 S.W.2d 320, 325 (Tex. App.-Houston [1st Dist.] 1995, no writ) ("The doctrine of ejusdem generis applies only when the contract is ambiguous."); see Dimotsis v. State Farm Lloyds , 5 S.W.3d 808, 811-12 (Tex. App.-San Antonio 1999, no pet.) (Rickhoff, J., concurring) (stating that courts do not resort to doctrine of ejusdem generis "unless we have already determined that a term is ambiguous," and concluding that party improperly relied on doctrine of ejusdem generis "to create an ambiguity where none exists.").

Hinder , Webster's New World College Dictionary (5th ed. 2014).

ConocoPhillips argues that TEC's inability to obtain financing is a mere "economic hardship" that, historically, would not excuse performance. TEC counters that the event is better described as an actual impediment that prevented, at least temporarily, performance, not something that added cost to performance or made it unprofitable. See Mainline , 407 F.Supp. at 427 (stating that, "in the absence of agreement intervening economic hardship is usually held to be insufficient legal justification for nonperformance"); cf. Va. Power , 297 S.W.3d at 401 n.5 (rejecting party's recasting of force majeure event as economic hardship when party claimed hurricane-not economic effect of hurricane-prevented performance). And it asserted that ConocoPhillips knew at the time the contract was executed that TEC would be relying on outside financing to drill the well, actually adding a provision in the contract identifying the likely financing source, Black-Brush Oil & Gas, L.P. According to TEC, this additional provision supports a determination that the parties agreed that TEC's inability to obtain outside financing constitutes a force majeure event.
Under the contract's terms, ConocoPhillips agreed that TEC may assign a portion of its rights in the leases to Black-Brush Oil & Gas in the future without requiring TEC to obtain ConocoPhillips's consent. It describes Black-Brush as an "affiliate" of TEC generally, without denoting it as a financing source. This provision does not establish TEC's force majeure defense nor negate it as a matter of law. Its inclusion in the agreement is not inconsistent with the interpretation of the force majeure provision to unambiguously excuse performance for causes outside TEC's reasonable control.

Mustang Pipeline Co. v. Driver Pipeline Co. , 134 S.W.3d 195, 196 (Tex. 2004) (per curiam) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.").

Farmout Agreement, art. 31.

See Ebands, supra n.10 at 876-77 (referring to force majeure provision as "savings clause" and stating, "By including a force majeure clause, parties to an oil and gas lease can contractually define the force majeure defense and provide for temporary suspension of lease obligations, instead of having the contract terminate as it occurs under the common law defenses. The force majeure clause defines certain contingencies that will constitute a force majeure event and sets forth the obligations of the parties should such an event arise. Accordingly, force majeure has become a 'creature[ ] of contract' with its contours based upon the confines set forth by the parties in their agreement, rather than depending upon the delineations of the common law defenses.") (footnotes omitted).

When incorporating an excused-delay provision to suspend obligations into a short-term contract, the parties may wish to negotiate and specify the length of suspension that would be tolerated, past which a breach occurs; however, these parties did not include such terms in their agreement.