

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00012-CV

_____

LCP HURST PRECINCT LINE, LLC, Appellant

V.

TEXAS TACO CABANA, L.P., Appellee

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 017-306302-19

Before Kerr, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

In this commercial lease dispute, Appellant LCP Hurst Precinct Line, LLC (LCP) sued Appellee Texas Taco Cabana, L.P. (Taco Cabana) for breach of contract. After a bench trial, the trial court entered a take-nothing judgment in favor of Taco Cabana and awarded it $250,000 in attorney's fees. On appeal, LCP raises three issues (with various subissues) challenging (1) the trial court's take-nothing judgment, (2) the trial court's interpretation of certain provisions of the lease, and (3) the sufficiency of the evidence supporting the attorney's-fees award. We will affirm.

## I. FACTUAL BACKGROUND[1]

### A. THE LEASE

On December 30, 2003, Taco Cabana entered into a lease (the Lease) for commercial property in Hurst, Texas (the Property), at which it would operate a fast-food restaurant.[2] The Lease had a 20-year term with the option for Taco Cabana to renew for four additional terms of five years each. It also granted to Taco Cabana a right of first refusal to purchase the Property if the landlord intended to sell it to a third party. Taco Cabana was required to pay monthly rent according to a schedule provided in the Lease, all taxes related to the Property, and all utilities.

---

[1]All background facts are drawn from the trial record.

[2]The original lessors were the Betty T. Ma Living Trust and the Ching-Ping Chang Revocable Trust. In July 2014, RVE Partners, Ltd. (RVE) purchased the Property and was assigned all rights as lessor under the Lease. LCP bought the Property from RVE in 2017.

Section Six of the Lease stated as follows:

Except as otherwise provided herein, Lessee, at its sole cost and expense, will take good care of the Premises and will keep the same in good order and condition and make all necessary repairs and replacements thereto, interior and exterior, structural and nonstructural, ordinary and extraordinary, and foreseen and unforeseen. The necessity for and adequacy of repairs to the Building and the Premises pursuant to this Article shall be measured by the standard that is appropriate for buildings of similar construction and use, giving due consideration to the remaining portion of the Lease Term. Anything to the contrary set forth herein notwithstanding, Lessee shall not be required to perform any item of maintenance, repair, replacement and the like to the heating, ventilating and air conditioning system, plumbing system, mechanical systems, electrical system, roof, foundation, and structural portions of the Premises or obligations for compliance with law, the cost of which would exceed $10,000.00 (hereinafter referred to as a "Capital Expense") during each of the last five (5) years of the Term, or, if Lessee has exercised any of its option to renew, during each year of the Renewal Term then in effect. In the event a Capital Expense occurs as provided herein, Lessee shall have the right to terminate the Lease.

Section Sixteen of the Lease provided that events of default included (1) nonpayment of rent that remained uncured for more than ten business days after written notice and (2) the failure of Taco Cabana "to perform any material obligation" under the Lease that remained uncured for more than thirty business days after written notice. Finally, the Lease required that the defaulting party or nonprevailing party to a legal dispute brought on the Lease be responsible for all fees (including attorney's fees) incurred by the prevailing party.

Taco Cabana and the original lessors executed and recorded in Tarrant County a Memorandum of Lease, which referenced various provisions of the Lease, including the term, renewal options, and right of first refusal.

3

**B. LCP BUYS THE PROPERTY; TACO CABANA SEEKS TO TERMINATE**

On July 10, 2017, Taco Cabana notified its then-landlord, RVE, that it was ceasing its restaurant operations at the Property but reserving all of its continuing rights under the Lease. Accordingly, Taco Cabana vacated the premises but also continued to pay all rent and other amounts due under the Lease.

Then, in November 2017, LCP purchased the Property from RVE[3] and assumed all rights as lessor under the Lease. As part of its due diligence before completing the purchase, LCP had hired EnviroPhase to complete a property condition assessment in September 2017 (the EnviroPhase Report). The EnviroPhase Report was created after a "visual site observation" of the Property and its various systems and structures, including the HVAC and plumbing systems. The Property was reported as being in "overall good condition," and it appeared that "[a]dequate maintenance programs" had been in place for the major systems and equipment.

Specifically, EnviroPhase reported that it had inspected two HVAC units on the roof of the restaurant—one model from 2016 and another from 2004.[4] It was reported that the 2016 unit was in "excellent" condition, while the 2004 unit was in "fair" condition and would likely need replacing within the next six years at an

---

[3]LCP had been formed by its parent company, Leon Capital Group, for the purpose of acquiring the Property.

[4]The record shows that there are actually three HVAC units on the roof—one 2016 model and two 2003 models. It is not clear why EnviroPhase only inspected two units or why it referred to one of the units as a 2004 model.

estimated cost of $12,000. LCP contends that it relied on EnviroPhase's assessment of the Property's condition when deciding whether to purchase the Property.

On January 2, 2019, Taco Cabana's director of facilities, Wayne Jones, emailed a representative of Building Air Services, Inc. (BAS) to request an inspection of the HVAC units at the Property. Jones stated that it was his understanding that "if there's a need for $10k or more in HVAC repairs, we may be able to walk away [from the Lease]." BAS inspected the units and provided Taco Cabana with a quote of $11,413 for the diagnosis and repair of the HVAC units. BAS reported that the 2016 unit was in good working order but recommended that the two 2003 units be replaced due to their "age and condition[]."

On January 31, 2019, Taco Cabana also hired Ameritech Facility Services, LLC (Ameritech) to inspect the HVAC and plumbing systems. Ameritech quoted Taco Cabana $35,821 of needed repairs or replacements to the HVAC units and $3,945 of needed repairs to the plumbing system. It agreed that the 2016 HVAC unit was working properly and noted that it had "moderate hail damage." As for the 2003 units, Ameritech recommended that they be replaced "due to excessive hail damage" and because those types of units were "being phased out."

On February 4, 2019, with these repair estimates in hand, Taco Cabana sent a letter notifying LCP that it was terminating the Lease pursuant to its rights under Section Six. On February 19, 2019, LCP responded with a letter entitled "Th[ir]d Denial of Termination" in which it explicitly rejected Taco Cabana's Lease

5

termination and its interpretation of Section Six; the letter did not contain any language about any specific default or Taco Cabana's need to cure. Emails between the parties during this time show that LCP believed that Taco Cabana was merely attempting to "trump up a situation that result[ed] in the potential to terminate the [L]ease frivolously."

Later that month, LCP sent one of its representatives, Nick Paruch, to inspect the Property. Paruch took photographs showing that the Property contained dead rodents, rodent droppings, water leaks, and dirty HVAC-unit components.[5]

In March 2019, LCP hired Quigley Heating and Air Conditioning (Quigley) to inspect the HVAC units. Quigley reported that the 2016 unit was in "good shape" but that both of the 2003 units were "in poor condition due to lack of maintenance." Quigley provided an estimate for extensive repairs to be made to the 2003 units in the amount of $20,394. Quigley's president, testifying as an expert, said that there was also hail damage to the units and that it would have taken years of non-maintenance for the 2003 units to reach the conditions found in February 2019. He also testified that no hail events occurred at the Property between December 30, 2018—the date when the Lease term entered its last five years—and when Taco Cabana first requested a quote to repair the HVAC system.

_____

[5]An LCP expert testified at trial that the condition of the Property as depicted in Paruch's photos would not meet the appropriate building, health, or HVAC standards required for operating a restaurant.

6

## C. LCP Sues Then Sells The Property

LCP sued Taco Cabana on February 22, 2019, alleging two counts: anticipatory breach of contract and breach of Section Six of the Lease. Nearly six months later on August 2, 2019, LCP sent a notice of default to Taco Cabana. In this notice, LCP explained that it had regarded Taco Cabana's attempted termination as an anticipatory breach of the Lease and that LCP, therefore, had not been required to provide notice of default. Regardless, LCP posited that its February 19 letter had served as a notice of default and cure. LCP concluded that Taco Cabana had defaulted by failing to pay rent since February 2019 and by failing to maintain the Property as required by Section Six of the Lease. LCP told Taco Cabana that these defaults needed to be cured within ten days and thirty days respectively.

In March 2022, while the case was pending in the trial court, LCP sold the Property. To satisfy the title objections, LCP was required to execute an affidavit concerning the expiration or termination of the Lease (the Affidavit). LCP and the buyer negotiated the wording to be used in the Affidavit. The original draft of the Affidavit stated that the Lease "was terminated in February 2019." At LCP's request, this wording was changed to state that the Lease "was terminated *by Tenant* in February 2019." [Emphasis added.] Fernando De Leon signed the Affidavit on behalf of LCP, and it was recorded in the Tarrant County records upon the sale of the Property. At trial, LCP's former in-house counsel testified that the Affidavit was signed "to get the Memorandum of Lease off the title commitment so that [LCP]

could sell the [P]roperty," not as any expression that LCP had accepted Taco Cabana's attempt at termination.

### D. JUDGMENT; ATTORNEY'S FEES; FINDINGS OF FACT AND CONCLUSIONS OF LAW

A bench trial was held in August and October of 2022. LCP proffered evidence of damages for unpaid rent ($494,291.16), unpaid taxes ($78,506.88), and HVAC repairs ($20,394.30).[6] Taco Cabana did not controvert these damages amounts.

After trial, the trial court entered its Partial Judgment, which ordered that LCP take nothing on its claims and—pursuant to the Lease—that Taco Cabana receive its attorney's fees, costs, and expenses.

A separate hearing was held to determine the amount of attorney's fees. Taco Cabana's attorney testified at the hearing, and documentation of his firm's work on the case (Fee Statements) was admitted as evidence. The Fee Statements comprise thirty-eight pages of documents containing hundreds of task entries from the firm's work on the case between February 2019 and the attorney's-fees hearing in November 2022. The entries show the date, amount of time, rate billed, and person who worked on each task and also brief descriptions of each task. In total, the firm claimed to have billed Taco Cabana a total of $253,975 for its work through trial and

---

[6]The amount for HVAC-repair damages was drawn from the Quigley estimate; LCP never paid to have the HVAC units repaired.

$4,641 for its costs. Taco Cabana asked the trial court to award it $250,000 to cover its attorney's fees.

Taco Cabana's attorney testified that the $250,000 amount was reasonable and necessary for the work completed on this case. He also testified that the amount that his firm charged Taco Cabana was $13,000 less than the amount charged to LCP by its attorneys in this case.

LCP called an attorney's-fees rebuttal expert, David Drez, who opined that not all of the time entries in the Taco Cabana Fee Statements adequately described the work that was performed. According to Drez, the objectionable entries totaled about $44,000 and provided "virtually no description aside from 'preparation of e-mail' . . . or 'legal analysis of e-mail.'" He opined that these charges were not adequately supported with evidence showing them to be reasonable and necessary. However, Drez generally conceded that the rates and hours charged to Taco Cabana were reasonable:

> Q. [D]o you take any issue or contest the rates charged by [Taco Cabana's attorneys] in this matter?
>
> A. Not at all. And I'll note too, I don't take any issue with the appellate fees sought.
>
> Q. Have you formed an opinion as to the number of hours spent in this case . . . being sought by Taco Cabana?
>
> A. I think they're in a range of reasonableness, but I . . . focused more on the time entries that were provided and reviewed those.

9

After the hearing, the trial court awarded Taco Cabana $250,000 for its attorney's fees. It then filed its findings of facts and conclusions of law (FFCLs), which included the following:

3. Under Section 6 of the Lease, Taco Cabana had the right to terminate the lease in the event a "Capital Expense" occurs during the last five (5) years of the Lease (December 30, 2018–December 29, 2023). Section 6 of the Lease defined "Capital Expense" specifically as the "maintenance, repair, replacement and the like to the heating, ventilating and air conditioning system, plumbing system, mechanical systems, electrical system, roof, foundation, and structural portions of the Premises or obligations for compliance with law, the cost of which would exceed $10,000.00." Thus, if a Capital Expense occurred at any time after December 30, 2018, Taco Cabana was permitted to terminate the Lease.

. . .

6. From July 10, 2017[,] through February 5, 2019 (the "Shuttered Period"), Taco Cabana continued to pay rent under the Lease, first to RVE (prior to its sale of the Property to LCP), then to LCP. At no time during the Shuttered Period did either RVE or LCP give Taco Cabana any written notice of any alleged default under the Lease attributable to any alleged failure by Taco Cabana to maintain the Property.[7] After purchasing the property and prior to February 5, 2019, LCP never inspected the Property or any portion thereof.

7. On January 10, 2019, Taco Cabana obtained a proposal from [BAS] (the "BAS Quote") for repair and/or replacement of the Property's

[7]In a footnote to FFCL six, the trial court also stated that

Section 16(A) of the Lease required the Lessor (RVE or LCP, as the case may be) to give Lessee (Taco Cabana) prior written notice and thirty (30) business days' opportunity to cure (or such longer period if such failure cannot be reasonably cured within such period[]) of Lessee's failure to perform any material obligation under the Lease (other than failure to pay Rent or Additional Rent, in which case, Lessor was only required to give ten (10) business days' opportunity to cure[]).

10

[HVAC System] in the amount of $11,413.03. On January 31, 2019[,] Taco Cabana obtained a proposal from Ameritech . . . (the "Ameritech Quote") for repair and/or replacement of the HVAC System and the plumbing system in the amount of $43,032.62. Thus, both the BAS Quote and the Ameritech Quote evidenced a "Capital Expense" the cost of which *would* exceed $10,000 that occurred during the last five years of the Term of the Lease. LCP acknowledged, and does not dispute, the need and cost of the repairs and/or replacements as evidenced by the BAS Quote and the Ameritech Quote.[]

8. Based upon the BAS Quote and the Ameritech Quote, Taco Cabana exercised its termination right under Section 6 of the Lease by letter dated February 4, 2019 (with the termination being effective February 5, 2019) (the "Termination Notice"). In the Termination Notice, Taco Cabana also advised LCP that Taco Cabana would be removing its security equipment the next day and that LCP should "secure the building." Thereafter, LCP retook possession of the Property, conducted inspections, and began marketing it for lease or sale.

9. Over three years later, on March 28, 2022, LCP sold the Property to QT South, LLC (the "QT Sale"). To satisfy the buyer's title objections regarding the Memorandum of Lease and close the QT Sale, Fernando De Leon, on behalf of LCP, executed an "Affidavit as to Expiration or Termination of Agreement" that was recorded . . . in the Official Public Records of Tarrant County, Texas (the "De Leon Affidavit"). In the De Leon Affidavit, Mr. De Leon stated that "the Lease was terminated by Tenant in February 2019," specifically referencing the Termination Notice (a copy of which was attached to the De Leon Affidavit).

10. LCP's execution of, and reliance upon, the De Leon Affidavit to satisfy the buyer's title objections and to close the [sale of the Property] constituted a surrender of the Lease as a matter of law, also precluding LCP's recovery on its claims against Taco Cabana.[]

11. Even if Taco Cabana did not have the right to give the Termination Notice on February 4, 2019, LCP is still not entitled to any recovery against Taco Cabana. LCP elected to treat Taco Cabana's February 2019 termination as an anticipatory breach of the Lease. Consequently, LCP was limited to the recovery of the present value of the rentals that accrued under the Lease, reduced by the reasonable cash market value of the Lease for the unexpired term.[] However, at trial, LCP failed to offer

any evidence of either the present value of the rentals that accrued under the Lease *or* the reasonable cash market value of the Lease for the unexpired term.

12. Under Texas Law, attorney's fees may be recovered only when they are provided for by statute or by contract between the parties.[] Section 34 of the Lease provided that the nonprevailing party shall pay any and all actual costs and expenses incurred by the prevailing party in enforcing or establishing its rights under the Lease, including, without limitation, all court costs, all fees and costs incurred in any appellate process, and all actual attorney's fees and in-house counsel costs.

13. Because Taco Cabana is the prevailing party, Taco Cabana is entitled to an award of attorneys' fees it incurred through trial, a conditional award of its appellate attorney's fees, and costs and expenses as follows:

    a.  the sum of $250,000.00 for legal representation of Taco Cabana through trial and the completion of proceedings in this Court. . . .

14. LCP is not entitled to recover attorney's fees or interest from Taco Cabana.

## II. DISCUSSION

LCP raises three main issues on appeal:

1. The trial court erred by entering a take-nothing judgment on LCP's breach of contract claims because the undisputed evidence conclusively established that Taco Cabana breached the Lease by failing to pay rent and taxes.

2. The trial court erred in its interpretation of Section Six of the Lease as allowing Taco Cabana to terminate the Lease.

3. The evidence was factually and legally insufficient to support the award of $250,000 for Taco Cabana's attorney's fees.

We will consider LCP's second issue first because its determination will help dispose of issue one.

## A. INTERPRETATION OF SECTION SIX OF THE LEASE

LCP argues in its second issue[8] that Section Six unambiguously provides that a Capital Expense occurs when the *damage* giving rise to the Capital Expense took place and that Taco Cabana had no right to terminate under Section Six if the damage occurred before the last five years of the Lease's initial term. It contends that the trial court erred by interpreting Section Six as allowing Taco Cabana to terminate the Lease regardless of when that damage occurred. Taco Cabana counters that Section Six does not require that the damage precipitating a claimed Capital Expense must have occurred within the last five years of the Lease term, only that a termination-eligible Capital Expense occurred if there existed, within that five-year period, an applicable repair that would cost more than $10,000[9] to fix. We agree with Taco Cabana.

---

[8]LCP's second issue includes four subissues: (A) Whether Taco Cabana's prior material breach of Section Six for failing to maintain the Property precluded it from terminating the Lease; (B) Whether a Capital Expense under Section Six occurs when the damage occurred or when the repair quote was issued; (C) Whether De Leon's Affidavit constituted a surrender as a matter of law; and (D) Whether LCP had treated Taco Cabana's alleged breaches as a continuous or anticipatory breach and whether this limited its recoverable damages.

[9]The parties do not dispute that the HVAC system needed more than $10,000 in repairs.

### 1. Trial Court Properly Interpreted Section Six

Interpretation of a contract involves questions of law that we consider de novo. *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 387 (Tex. 2021). We also review a trial court's construction of a contract de novo. *Dan Dilts Constr., Inc. v. Weeks*, No. 02-17-00373-CV, 2018 WL 5668530, at *2 (Tex. App.—Fort Worth Nov. 1, 2018, no pet.) (mem. op.).

If a contract is unambiguous, we construe it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). A contract is unambiguous if it can be given one certain or definite legal interpretation. *Lane-Valente Indus. (Nat'l), Inc. v. J.P. Morgan Chase, N.A.*, 468 S.W.3d 200, 205 (Tex. App.—Houston [14th Dist.] 2015, no pet.). The fact that the parties disagree about a contract's meaning does not necessarily show that the contract is ambiguous. *Id.*

Contract construction begins with the express language of the agreement. *Gulliksen v. Gulliksen*, No. 02-20-00202-CV, 2021 WL 1803616, at *3 (Tex. App.—Fort Worth May 6, 2021, no pet.) (mem. op.). When a contract's meaning is disputed, our primary objective is to ascertain and give effect to the parties' intent as expressed in the contract. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018). In construing a contract, we may neither rewrite it nor add to its language. *Schaefer*, 124 S.W.3d at 162. Also, we must remember that parties to a contract

> are considered masters of their own choices. They are entitled to select
> what terms and provisions to include in a contract before executing it.
> And, in so choosing, each is entitled to rely upon the words selected to

14

demarcate their respective obligations and rights. In short, the parties strike the deal *they* choose to strike and, thus, voluntarily bind themselves in the manner *they* choose.

*Doe v. Tex. Ass'n of Sch. Bds., Inc.*, 283 S.W.3d 451, 458 (Tex. App.—Fort Worth 2009, pet. denied) (quoting *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.—Amarillo 2000, no pet.)). We cannot change the contract simply because one of the parties dislikes its provisions or wishes that it provided for something that it does not. *Thedford Crossing, L.P. v. Tyler Rose Nursery, Inc.*, 306 S.W.3d 860, 867 (Tex. App.—Tyler 2010, pet. denied) (op. on reh'g); *Birnbaum v. Swepi LP*, 48 S.W.3d 254, 257 (Tex. App.—San Antonio 2001, pet. denied); *Cross Timbers*, 22 S.W.3d at 26.

Section Six of the Lease is unambiguous. It contains two interrelated provisions: (1) that Taco Cabana was required to maintain the Property and make all necessary repairs so that the Property met the standards of a fast-food restaurant (the Maintenance Provision) and (2) that—in the event of a Capital Expense "during each of the last five years of the [Lease term]"—Taco Cabana was not required to make certain repairs to the Property and could terminate the Lease (Termination Provision). A Capital Expense is defined as any "item of maintenance, repair, replacement and the like" to the HVAC system or other delineated components of the Property "which would exceed $10,000." It then provides that "[i]n the event [that] a Capital Expense occurs as provided herein," Taco Cabana had the right to terminate the Lease.

15

Accordingly, Section Six of the Lease provides that Taco Cabana had the right to terminate the Lease if, within the last five years of the Lease term, there were any required repairs to the HVAC system that exceeded $10,000. Section Six says nothing about when the precipitating damage must have occurred. Thus, because it is undisputed that there existed more than $10,000 in needed repairs to the HVAC system within the last five years of the Lease, we hold that the trial court did not err in interpreting Section Six as allowing Taco Cabana to terminate the Lease.

### 2. Subissue A

In subissue A of issue two, LCP argues that "the evidence conclusively established that Taco Cabana was in prior material breach for failing to maintain the premises, so Taco Cabana cannot use its own breach as a reason to terminate the [L]ease." In LCP's view, the evidence showed that Taco Cabana had breached the Lease because the hail damage and lack of maintenance on the HVAC system occurred before the last five years of the Lease term, when Taco Cabana had a duty to repair and properly maintain the system. Taco Cabana could not then, says LCP, use this breach as a set-up to terminate the Lease. *See Dorsett v. Cross*, 106 S.W.3d 213, 220 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("A party to a contract may not set up his own breach to relieve himself of his contractual obligations; nor may he set up his breach as the basis for recission of the contract or as the ground for his own recovery.").

16

This argument is thwarted by the language of Section Six itself, which explicitly subordinates Taco Cabana's duty to maintain the Property to its right not to be required to make Capital-Expense repairs within the last five years of the Lease. The opening phrase of Section Six's Maintenance Provision states that Taco Cabana was required to maintain the Property "[e]xcept as otherwise provided herein." This language harmonizes with the subsequent opening phrase of the Termination Provision, which states that, "[a]nything to the contrary set forth herein notwithstanding," Taco Cabana was not required to make any Capital Expense repair in the last five years of the Lease.

Courts have recognized that when parties use such "notwithstanding" language in a contract, "they contemplate the possibility that other parts of their contract may conflict with that paragraph, and they agree that this paragraph must be given effect regardless of the contrary provisions of the contract." *Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 643 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *see Parsley Minerals, LLC v. Flat Creek Ress., LLC*, No. 03-21-00337-CV, 2023 WL 2052315, at *7 (Tex. App.—Austin, Feb. 17, 2023, no pet.) (mem. op.) ("The purpose of such a clause is to ensure that the [relevant] provision controls over any other potentially conflicting provision of the contract.").

There is a clear conflict between the Maintenance Provision and the Termination Provision. Either Taco Cabana was liable for paying for the HVAC repairs because it had breached the Maintenance Provision or it was absolved of that

17

duty because the need for such repairs constituted a Capital Expense within the last five years of the Lease under the Termination Provision. In the face of this conflict, the plain language of the contract tells us that the Termination Provision must prevail. Thus, any alleged prior breach for failing to maintain the Property is necessarily subsumed by Taco Cabana's right to forgo such maintenance and choose to terminate the Lease.

We agree that, generally, a contracting party cannot use its own breach as a basis to terminate a contract. *See Dorsett*, 106 S.W.3d at 220. However, for the reasons already explained, Taco Cabana acted within its rights under the Lease by refusing to pay for a Capital Expense existing within the last five years of the Lease and then terminating on that basis. That right trumps any obligation it may have had during the first fifteen years of the Lease to repair the HVAC system. LCP entered into the Lease with eyes wide open and we cannot disturb that agreement no matter how unfavorable it may be to LCP. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 482 (Tex. 2017) ("Freedom of contract is a policy of individual self-determination; individuals can control their destiny and structure their business interactions through agreements with other competent adults of equal bargaining power, absent violation of law or public policy.").[10]

---

[10]Within subissue A, LCP makes the passing argument that the trial court's footnote within FFCL number six "appears to suggest that LCP failed to comply with a notice of default provision in the Lease" and was, therefore, "unsupported by factually and legally sufficient evidence." We disagree because the trial court did not

18

Accordingly, we overrule subissue A.

### 3. Subissues B, C, and D

Having held that the trial court did not err in its interpretation of the Lease, we overrule LCP's subissue B in which it contends that the trial court erred by failing to interpret a Capital Expense as having occurred when the antecedent damage occurred. Further, we need not reach LCP's subissues C and D because our holding renders moot any determination concerning De Leon's Affidavit and the calculation of LCP's damages. *See* Tex. R. App. P. 47.1.

### B. LCP'S CLAIMS FOR UNPAID RENT AND TAXES

In its first issue, LCP argues that the trial court erred by entering a take-nothing judgment on LCP's breach of contract claims for unpaid rent and taxes because the undisputed evidence established that Taco Cabana had breached the Lease. LCP maintains that Taco Cabana did not pay rent and taxes under the Lease starting in March 2019. However, this argument rests on the assumption that Taco Cabana did not properly terminate the Lease in February 2019 when it notified LCP of its intention to do so based on the needed repairs to the HVAC system. Because we

make any findings of fact in that footnote; it merely summarized a portion of the default provision from the Lease. Regardless, determination of this argument is not necessary because our overarching holding on issue two—that the trial court did not err by interpreting Section Six as allowing Taco Cabana to terminate the Lease— forecloses the need to decide whether LCP failed to comply with the Lease's default notice provision. *See* Tex. R. App. P. 47.1 (requiring courts to "hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal").

19

have already held that the trial court did not err by interpreting the Lease to have allowed Taco Cabana to terminate the Lease in February 2019, it necessarily follows that Taco Cabana had no duty to pay rent or taxes after that point.

For these reasons, we hold that the trial court did not err by entering a take-nothing judgment on LCP's claims, and we overrule LCP's first issue.

## C. ATTORNEY'S FEES

In its third and final issue, LCP contends that the evidence was legally and factually insufficient to support the award of attorney's fees to Taco Cabana. Specifically, LCP contends that Taco Cabana's attorney's-fees evidence (1) included overly-vague billing statements; (2) did not show any reduction in fees; (3) did not include actual invoices from its attorneys; and (4) did not include documentation showing the amount Taco Cabana actually paid to its attorneys. Again, we disagree with LCP.

A factfinder's starting point for calculating an attorney's-fees award is to determine the reasonable hours worked multiplied by a reasonable hourly rate; the fee claimant bears the burden of providing sufficient evidence on both counts. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 498 (Tex. 2019). Sufficient evidence, at a minimum, includes evidence of (1) particular services performed; (2) who performed those services; (3) approximately when the services were performed; (4) the reasonable amount of time required to perform the services; and (5) the reasonable hourly rate for each person performing the services. *Id.* at 498, 502.

20

Reasonableness and necessity are not dependent solely on the contractual fee arrangement between the prevailing party and its attorney; the base lodestar calculation should reflect hours reasonably expended for services necessary to the litigation and a reasonable hourly rate for the attorney to prosecute or defend successfully against the claim at issue. *Id.* at 498–99; *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012) (explaining that the trial court calculates the lodestar).

Contemporaneous billing records are not strictly required to prove the reasonableness and necessity of the requested fees but are strongly encouraged. *Rohrmoos*, 578 S.W.3d at 502. While generalities about tasks performed are not sufficient for the factfinder to meaningfully review whether the tasks and hours were reasonable and necessary, *Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014), "[t]he factfinder will generally not benefit from attorneys cross-examining each other point-by-point on every billable matter." *Rohrmoos*, 578 S.W.3d at 503 (stating that the supreme court does not endorse "satellite litigation as to attorney's fees" and that "[p]arties should use discovery and pretrial procedure to evaluate attorney's fee claims and the evidence supporting them, then present to the fact[]finder the evidence relevant to determining" what fees are reasonable and necessary).

"[T]here is a presumption that the base lodestar calculation, when supported by sufficient evidence, reflects the reasonable and necessary attorney's fees that can be shifted to the non-prevailing party." *Id.* at 499. However, "exceptional

circumstances" may justify enhancements or reductions to the base lodestar. *El Apple I*, 370 S.W.3d at 765. "[I]f a fee opponent seeks a reduction, it bears the burden of providing specific evidence to overcome the presumptive reasonableness of the base lodestar figure." *Rohrmoos*, 578 S.W.3d at 501.

## 1. Vagueness of the Fee Statements

LCP contends that portions of Taco Cabana's Fee Statements were vague because some of the fee entries were logged by unidentified individuals or for work with "virtually no description" apart from stating that emails had been prepared or analyzed. According to LCP, at least $44,000 of Taco Cabana's attorney's fees lacked adequate support in the record.

The Fee Statements include thirty-eight pages of what appear to be standard, contemporaneous time entries by Taco Cabana's attorneys. Every entry contains a date stamp, the full name or initials of the attorney who performed the work, a short description of the work performed, the time spent, and the rate billed for that entry. A table included with the Fee Statements identifies each attorney who performed work on the case, his initials, his hourly rate, the total hours worked on the case, and the total charges for each attorney. Further, the evidence showed that Taco Cabana's attorneys fees were $13,000 less than those charged by LCP's attorneys, and LCP's expert Drez testified that the rates and hours charged by Taco Cabana's attorneys were reasonable.

22

It is true that many of the firm's entries state that an attorney prepared or analyzed emails without providing more in-depth detail about the content of those emails or the analysis done. LCP contends, without providing any pertinent legal precedent, that such descriptions are overly vague and inadequate to support a fee award under *Rohrmoos*.

However, *Rohrmoos* instructs that the trial court's fees determination does not benefit from a point-by-point analysis of every billed matter. *Rohrmoos*, 578 S.W.3d at 503. It is easy to see why this is true, particularly in the context of a years-long dispute during which an attorney might send and receive hundreds of emails. To require a trial court to take a fine-toothed comb to every such email would not only be inefficient and result in the very satellite litigation that *Rohrmoos* warned against, it could, in many cases, require an attorney to divulge protected work product or other privileged information. If LCP had desired to test the substance of each and every time entry, it should have done so through the appropriate discovery mechanisms, as *Rohrmoos* suggests, rather than asking the trial court to do the heavy lifting. *See id.*

For these reasons, we hold that Taco Cabana's Fee Statements were not overly vague.

## 2. Reduction of Taco Cabana's Fees

LCP next argues that Taco Cabana did not reduce the fees it sought, which LCP claims it was required to do.

23

As the party opposing the attorney's-fees amount, LCP bore the burden of showing with "specific evidence" that an "exceptional circumstance" existed here so as to justify the reduction of the base lodestar figure. *Rohrmoos*, 578 S.W.3d at 501; *El Apple I*, 370 S.W.3d at 765. But LCP provided no such evidence and, instead, wrongfully asserts that Taco Cabana bore the burden of reducing this amount. Accordingly, we overrule this argument.[11]

### 3. Lack of Invoices and Actual Amount Paid By Taco Cabana

Lastly, LCP argues that the evidence supporting the attorney's-fees award was insufficient because Taco Cabana "did not offer actual invoices it received" from its attorneys, nor did it "offer any documentation into evidence showing the amount it actually paid in legal fees." LCP cites no legal authority to support the contention that Taco Cabana was required to proffer particular invoices or evidence showing how much it had actually paid in fees, and we are not aware of any such requirements. We overrule this argument.

For these reasons, we hold that the evidence was sufficient to support the attorney's fees award to Taco Cabana, and we overrule LCP's third issue.

---

[11]To the extent that LCP argues that Taco Cabana should have reduced its base lodestar amount by $44,000 due to the alleged vagueness of the email time entries in the Fees Statement—an argument that is not wholly apparent on the face of LCP's appellate brief—we overrule that argument for the reasons already adduced above.

24

## III. CONCLUSION

Having overruled all of LCP's issues, we affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Delivered:  May 16, 2024