**Opinion issued November 26, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-22-00882-CV**
_____

**JONATHAN BERYL HARRIS, THE LAW OFFICES OF J.B. HARRIS, P.A., AND J.B. HARRIS, P.A., Appellants**

**V.**

**PHILLIP T. HOWARD AND HOWARD & ASSOCIATES, ATTORNEYS AT LAW, P.A., Appellees**

---

**On Appeal from the 127th District Court
Harris County, Texas
Trial Court Case No. 2019-22971**

---

**MEMORANDUM OPINION**

This is a breach of contract case. On the parties' agreed position that their contract is unambiguous, the trial court and parties halted a bench trial less than halfway through the first trial witness, and the trial court interpreted the contract as

a matter of law. Concluding that the contract could not be interpreted as a matter of law because it is ambiguous, we reverse and remand.

## Background

This case concerns a joint prosecution and fee sharing agreement between lawyers who represent sets of plaintiffs with tobacco-related claims. The underlying plaintiffs in the tobacco-related suits fit into two groups. The first group is known as the Broin cases and includes about 700 flight attendants who allege harm from second-hand exposure to cigarette smoke while on the job. Their claims are pending in Florida courts. Counsel of record for the Broin cases is Florida attorney J.B. Harris with the Law Offices of J.B. Harris, P.A.

The second group is known as the Engle Progeny cases and includes about 300 smokers who allege injury. Their claims are also pending in Florida courts. And their counsel of record is also J.B. Harris with the Law Offices of J.B. Harris, P.A.

Both sets of cases are under a litigation pause that allows them to remain dormant until activated for preparation for trial. In early 2017, only four of the nearly 1,000 cases were activated. Harris needed funding for trial preparation costs and was looking for a firm that would pay the trial-preparation expenses on the Broin and Engle Progeny cases in exchange for a share in attorney's fees later recovered.

## A.     The Fee Sharing Agreement between Harris and Howard

Harris's firm executed a joint prosecution and fee sharing agreement with another Florida law firm, Howard & Associates, P.A., in January 2017 to help fund the Broin and Engle Progeny litigation ("Fee Sharing Agreement"). The Howard law firm was operated by Tim Howard, who, at the time, was a licensed attorney in Florida.

The Fee Sharing Agreement addressed pending cases in terms of their trial-development status. The four Engle Progeny cases that had been activated—Sommers, Conniff, Bryant, and Gould—were discussed in detail. All other Broin and Engle Progeny cases were lumped together in treatment but were individually identified through an Exhibit to the Fee Sharing Agreement.

The Sommers case had been activated and was set for trial in just two months. Harris had an existing joint prosecution agreement with the other attorney referenced in the Fee Sharing Agreement. For his part, Harris had invested close to $50,000 working up the case. The Fee Sharing Agreement stated that Howard would be named co-counsel on the Sommers case, Howard would reimburse Harris all his expenses to date, Howard would be responsible for all of Harris's share of the expenses in the future, and any fee due Harris under the preexisting joint prosecution agreement would be split 50% to Harris and 50% to Howard. The contract has some contradictory terms that, at one point, said that Howard will act as a passive investor

and, at another point, stated that Howard may have to take depositions, help Harris meet case deadlines, and attend trial.

The Bryant and Conniff cases had also been activated but had not been set for trial yet. Harris had an existing joint prosecution agreement with counsel on those two cases as well. Harris had invested time and effort developing the two cases but had yet to incur any expenses for Howard to reimburse. The Fee Sharing Agreement stated that Howard would be responsible for all of Harris's share of the expenses in the future and any fee due Harris under the preexisting joint prosecution agreement would be split 60% to Howard and 40% to Harris.

The Gould case was the last of the activated cases addressed in the Fee Sharing Agreement. It had been activated, but Harris had incurred no expenses yet, it had not been set for trial yet, and there was no preexisting joint prosecution agreement in place. The Fee Sharing Agreement stated that Howard would be responsible for all case expenses in the future and any fee recovered would be split 80% to Howard and 20% to Harris.

Finally, all Engle Progeny and Broin cases individually identified in Exhibit "A" to the Fee Sharing Agreement would be handled the same as Gould: Harris would pay all case expenses, and the two firms would split any fee 80% to Howard and 20% to Harris.

Thus, the parties created a pay structure in which Harris and his firm would receive more of the fee when he had already invested time and money, while Howard and his firm would receive more of the fee when Harris had not begun to work on the case.

The Fee Sharing Agreement also provided that the Howard firm would hire Harris as a salaried employee with benefits. During the period of employment, Harris would have to work on the Engle Progeny and Broin cases and, in return, would receive $200,000 annual salary, a $25,000 sign-on bonus, health insurance, and a paid legal assistant. The Fee Sharing Agreement also gave Howard the right of first refusal to buy Harris's firm if Harris chose to sell his practice during the term of his employment with Howard.

The Fee Sharing Agreement specifically addressed the future of the Engle Progeny and Broin cases if the employment arrangement between Harris and Howard ended. If Howard stopped paying Harris's salary, all activated and inactive cases would be returned to Harris, subject to Howard retaining a cost lien and quantum meruit lien for time and money already invested. If the arrangement ended for any other reason, all inactive cases would be returned to Harris, and Harris would receive six weeks' severance pay. The contract did not specify what would happen to any activated cases in that event, like Gould, perhaps because the parties expected those to be resolved before the agreement might end.

5

Soon after the Fee Sharing Agreement was signed in 2017, Harris began contesting the terms of the agreement and arguing for revisions. In early 2018, Harris accused Howard of being late on payroll payments and demanded just over $80,000, which included a claim for severance pay. Harris also threatened to contact authorities about his belief that Howard was engaging in improper business tactics.

Around that time, a litigation finance investment company that had a preexisting relationship with Howard & Associates on an unrelated group of cases, entered the picture and began negotiating with Harris and Howard to resolve the dispute and create a new financing arrangement for the Engle Progeny and Broin cases. The financing entity was Virage Capital Management, L.P.

## B.     The CSA among Harris, Howard, and Virage

In April 2018, the three camps negotiated and executed a Confidential Settlement and Release Agreement ("CSA"). The CSA refers to Harris and his firm as the "Releasing Parties." Howard and his firm, along with Virage and its affiliated entities, are called the "Released Parties." But, in the end, both sides release each other for claims "of every kind or nature whatsoever, both in law and in equity, known or unknown, which" each side "has or ever had against" the other side "prior to, through, and including" the date of the contract. Harris and his firm, as the Releasing Party, also agree not to take legal action on any past or existing claim. And all parties agree not to make disparaging allegations or remarks about the others.

After these provisions to quiet the waters, the CSA addresses the transfer of funds, split on fees moving forward, other obligations of the parties, and a handful of other matters.

The transfer of funds. Virage agrees to pay Harris and his firm $50,000 as a "Settlement Amount" immediately. Howard and his firm agree to repay Virage the $50,000 amount. Virage also agrees to pay Harris and his firm $21,000 in monthly payments for 12 months. Those payments would be paid "subject to any default," and they could be "extended only at Virage's discretion." The 12 monthly payments would total $252,000. Again, Howard and his firm agrees to repay Virage the full amount of the monthly payments.

For their part, Harris and his firm agree that, if Howard does not repay Virage the monthly payments, Harris and his firm would enter into a loan agreement with Virage and repay to Virage the full amount of monthly payments it had made to Harris and his firm. Relatedly, both Harris and his firm and Howard and his firm agree to execute a security agreement to allow Virage to perfect a lien on the Engle Progeny and Broin cases as security.

In effect, Virage agreed to fund Howard's settlement of Harris's unpaid-salary claim and to fund Howard's continued monthly payments to Harris. Harris, for his part, would continue working up these cases for trial. And Virage would get a security interest in the cases.

The fee split. The CSA gave Harris and his firm 60% of the gross fee on specified cases and gave Howard and his firm 40%. These percentages were different from the percentages stated in the Fee Sharing Agreement. Harris's share went up considerably, and Howard's share went down.

The cases for which this new fee-sharing structure would apply were termed "Released Cases." The CSA tried to define the term, stating that "Released Cases" were a collective of

> the legal matters contemplated by the Joint Prosecution and Fee Sharing Agreement between The Law Offices of JB Harris, P.A. and Howard & Associates, Attorneys at Law, P.A. dated as of January 20, 2017 (as may be amended or supplemented subject to approval by Virage) ("Fee Sharing Agreement")

Other obligations of the parties. The CSA provided that "the Fee Sharing Agreement is hereby amended to eliminate any of the Howard Parties' obligations thereunder." In its place, both Harris and his firm and Howard and his firm agreed to use their "best efforts to prosecute, pursue and litigate the Released Cases in order to obtain payment of an award of proceeds on such Released Cases." And Harris and his firm agreed to use best efforts to have clients in the Released Cases sign powers of attorney and fee agreements to include Howard's firm. Harris also agreed to use best efforts to include Howard's firm on closing statements or settlement statements to then transfer an appropriate fee to Howard's firm. Harris and his firm also agreed

8

to use best efforts to associate co-counsel to prosecute the Released Cases and to pay any fee to that co-counsel from his 60% net fee.

The CSA required Harris and his firm to pay what became due to Howard on Released Cases into Howard's Virage account.

Other contractual matters. Along with other provisions not at issue here, the CSA had a clause specifying that the CSA is governed by the laws of the State of Texas with all parties agreeing to submit to the jurisdiction of any state court sitting in Houston, Texas, where Virage is located. And the CSA had a clause stating that the CSA "constitutes the entire agreement among the Parties and supersedes all prior or contemporaneous agreements and understandings (oral or written) with respect to the subject matter hereof."

## C. Events between the signing of the CSA and this suit

Virage paid Harris the $50,000 settlement amount and all 12 monthly payments. During that year, Harris failed to activate a single case from the Engle Progeny or Broin groups of cases. Virage did not extend payments beyond the 12 monthly payments required by the CSA.

When the twelfth monthly payment was due, Harris wrote to Virage that "whatever rights Virage and Howard have or think they have in my cases expires." Virage wrote back that it had made the final monthly payment but, in doing so, "Virage does not waive any of its rights under the Agreement," including its rights

in the event of a default by Harris and its right to fees and expenses if required to enforce the agreement. In turn, Harris wrote that the CSA "is hereby terminated," and retorted, "Good luck enforcing" the rights Virage claimed to continue to have. Harris also wrote that he might file a declaratory action, which he described as "the legal fight of a lifetime," and, in closing, wrote, "**GOVERN YOURSELF ACCORDINGLY**" (emphasis in original).

**D.    Declaratory judgment action and bench trial**

Howard and his firm petitioned for declaratory relief, asking the trial court to declare that the CSA grants Howard a 40% interest in the fees on all Engle Progeny cases and that Howard's interest did not expire after the 12 monthly payments were completed. (No mention was made of the Broin cases.) Virage intervened. Harris answered. Over a year later, Harris moved to compel mediation and arbitration under a provision in the Fee Sharing Agreement—not the CSA—but the trial court denied his motion. There were rounds of denied summary judgment motions as the case headed toward trial.

In March 2022, the Supreme Court of Florida disbarred Howard for conduct a decade earlier while representing an unrelated client. *Fla. Bar v. Howard*, No. SC19-488, 2022 WL 872176 (Fla. Mar. 24, 2022). Harris adapted his arguments to contend that Howard's disbarment precluded fee sharing. Virage and the attorney representing the court-appointed assignee of the Howard firm responded that

10

Harris's and Howard's firms were also parties to the CSA so that Howard's firm continued to have a contractual right to shared fees despite Howard's disbarment.

The Howard/Virage case against Harris proceeded to a bench trial held over three days in June 2022. On the first day, counsel for Virage told the trial court a list of witnesses Virage and Howard intended to call, beginning with M. Shellist of Virage Capital Management. As it turned out, Shellist would be the only witness to testify.

Day one began with opening statements by counsel for all three sets of parties. To the other parties' surprise, Harris conceded in his opening statement that the CSA was a valid and enforceable contract, that Howard's share of the fee was 40%, and that Virage had a lien on Howard's share.

Virage called its first witness, Shellist. While Shellist was on the stand, conversation between the trial court and counsel for all parties kept coming back to the effect of Harris's concessions and whether additional testimony was necessary. Both Harris and Virage agreed the CSA is unambiguous, which would mean the trial court could interpret it as a matter of law without the need for more evidence. *See Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 690 (Tex. 2022). The trial court appeared to agree because, during Shellist's testimony, the court sustained an objection to parol evidence on Virage's intent while negotiating the CSA, stated that the case seemed to present only a law issue instead of a factual

issue, and ultimately stated that the only thing the parties did not agree on was whether the contractual obligations under the CSA of 40% to the Harris firm goes into the future.

During these conversations, Harris put forth several theories of what the contract unambiguously means. He argued the term "Released Cases" in the CSA means only the four activated cases, not the hundreds of inactive cases listed on Exhibit A to the Fee Sharing Agreement, which was referenced in the CSA's attempt to define Released Cases. He argued Virage was contractually obligated to continue making monthly payments beyond the 12 months already paid, entitling him to close to $800,000 under the contract. Alternatively, he argued that the CSA expired on its own terms, which reverted the parties back to the Fee Sharing Agreement, through which Harris had a contract right to end his relationship with Howard and have all inactive cases returned to him without any lingering fee split. All different interpretations; all, according to Harris, the result of interpreting the unambiguous contract.

For their part, Virage and Howard vehemently disagreed that any of these were correct interpretations of the contract. They argued that the contract unambiguously gave Howard a right to 40% of fees in all Engle Progeny and Broin cases no matter when activated because Virage paid Harris $302,000 over a one-

year period, even though neither Howard nor Virage funded any case development on any case because none were activated.

Throughout these conversations, the parties maintained that the contract was unambiguous and subject to the court's interpretation without any additional evidence. In the end, Shellist was the only witness called on the merits of the case, and he was never cross-examined. The parties and trial court appeared to end the day coalesced around the idea of the court interpreting the contract as a matter of law.

Day two was spent with each party proving up their attorney's fees in support of each's claim for fees as the prevailing party under the CSA. Day three was spent on closing arguments, which were then followed with post-trial briefs. After that, the trial court issued its final judgment interpreting the CSA.

The trial court ruled that the CSA provision awarding the Howard firm 40% on the Released Cases is not time limited and that contractual obligation does not expire. In other words, because Howard/Virage paid Harris a $50,000 settlement amount and 12 monthly payments of $21,000, for a total of $302,000, the Howard law firm now held an on-going right to 40% of any fee Harris receives on any of the more than 300 Engle Progeny cases yet to be activated.

Harris appealed. In four issues, he contends the trial court misinterpreted the CSA, erred in allowing a disbarred attorney an interest in legal fees, and erred in failing to enforce the arbitration clause in the 1997 Fee Sharing Agreement. Because

we conclude the court erred in concluding the contract is unambiguous, we reverse and remand.

## The CSA is Ambiguous

In his first two issues, Harris contends the trial court misinterpreted the CSA, first by applying the Howard law firm's right to a 40% fee to all the inactive cases referenced in the CSA, and second, by failing to conclude the CSA and its provision awarding fee percentages to Howard's firm expired once Virage made its twelfth monthly payment. To be clear, Harris does not contend the CSA is ambiguous. He continues to maintain it is unambiguous and subject to interpretation as a matter of law. He argues, instead, that the trial court misinterpreted it.

### A.    Standard of review and applicable law

Whether a contract is ambiguous is a matter of law for the court. *In re Davenport*, 522 S.W.3d 452, 456 (Tex. 2017). In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the contract. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing its provisions with reference to the whole agreement. *Frost Nat'l Bank*, 165 S.W.3d at 312; *Webster*, 128 S.W.3d at 229. We construe contracts "from a

14

utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank*, 165 S.W.3d at 312 (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). A "primary determinant of meaning" is context. *Brown v. City of Hous.*, 660 S.W.3d 749, 754 (Tex. 2023) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012)); *see Frost Nat'l Bank*, 165 S.W.3d at 312. For that reason, language that might evoke one meaning when read in isolation will often be made more precise by considering its contextual use, in light of other contractual provisions. *Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 340 (Tex. 2023); *see Frost Nat'l Bank*, 165 S.W.3d at 312–13; *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018).

When a contract's meaning is disputed, our primary objective is to ascertain and give effect to the intentions the parties objectively manifested in their written instrument. *Finley Res.*, 672 S.W.3d at 339; *URI*, 543 S.W.3d at 763. Because objective intent controls, our focus is on the contract's language, not subjective beliefs. *Finley Res.*, 672 S.W.3d at 339; *URI*, 543 S.W.3d at 763–64. When construing a contract, the terms are typically given "their plain, ordinary, and generally accepted meaning." *In re Davenport*, 522 S.W.3d at 456-57 (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). If contract

15

language can be given a certain or definite legal meaning when considered as a whole, and considering the objective circumstances of its execution, the contract is not ambiguous and must be construed as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312.

A contract is considered ambiguous, on the other hand, when its meaning is uncertain and doubtful or when it is reasonably susceptible to more than one interpretation. *In re Davenport*, 522 S.W.3d at 456; *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Only when a contract is determined to be ambiguous may a court consider the parties' interpretation or admit extraneous evidence to determine the true meaning of the instrument. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). When a contract is ambiguous, "a fact finder should resolve the meaning." *Progressive Cnty. Mut. Ins. Co. v. Kelley*, 284 S.W.3d 805, 809 (Tex. 2009). In other words, once a contract is found to be ambiguous, the interpretation of the contract becomes a fact issue, *Coker*, 650 S.W.2d at 394, and extrinsic evidence is admissible to determine its meaning. *Robinson v. Robinson*, 961 S.W.2d 292, 298 (Tex. App.—Houston [1st Dist.] 1997, no pet.).

Importantly, a court may conclude a contract is ambiguous even in the absence of a claim of ambiguity by the parties. *J.M. Davidson*, 128 S.W.3d at 231. And an appellate court may consider whether a contract is ambiguous for the first time on

16

appeal. *See Furmanite Worldwide, Inc. v. NextCorp, Ltd.*, 339 S.W.3d 326, 332 (Tex. App.—Dallas 2011, no pet.) (in context of appeal of summary judgment, stating, "The court of appeals may determine ambiguity as a matter of law for the first time on appeal."); *Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 347 (Tex. App.—Dallas 2004, pet. denied) (involving appeal of jury verdict reduced to judgment) (citing *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 444–46 (Tex. 1993)).

## B.    Analysis

Because of Harris's concessions during opening statements, all parties agreed the CSA was a valid, enforceable contract that awarded Howard 40% of Harris's attorney's fees. The parties agreed the CSA was unambiguous and called on the trial court to interpret the contract as a matter of law to resolve whether Howard's right to 40% of fees received by Harris continued to exist after Virage paid its twelfth and final monthly payment to Harris. The trial court held that the Howard firm had an unexpired right to 40% of the fees on cases included in the CSA's reach. In our view, however, the CSA is filled with contradictory language that leaves it vague and ambiguous, such that the trial court could not interpret it as a matter of law.

We begin with the CSA's reference to the Fee Sharing Agreement. Section 4(a) of the CSA states that Howard & Associates, Attorneys at Law, P.A. "retains a net fee of 40% of the gross fee from the legal matters contemplated by" the Fee

Sharing Agreement, which it collectively defined as the "Released Cases." The Fee Sharing Agreement, in turn, attached as Exhibit "A" a full case list of all 300 or so Engle Progeny cases and a full case list of all 700 or so Broin cases. It attached as Exhibit "B" the Sommers, Bryant, and Conniff retainer agreements. And it attached as Exhibit "C" a spreadsheet of costs incurred in Sommers before Howard agreed to reimburse that expense. All the individual Engle Progeny and Broin cases were incorporated into the Fee Sharing Agreement, thus they were legal matters contemplated by it.

A plain reading of Section 4(a) is that all the Engle Progeny and Broin cases are "legal matters contemplated by the . . . Fee Sharing Agreement," as they are discussed in the terms of the agreement and listed by name in an attachment to the agreement.

The CSA states that the Howard law firm "retains a net fee of 40% of the gross fees" from those legal matters contemplated in the Fee Sharing Agreement "as may be amended or supplemented subject to approval by Virage." This provision indicates that the Fee Sharing Agreement continues to be an enforceable agreement beyond the date of the CSA because it can be "amended or supplemented" still.

Likewise, the CSA states that the Fee Sharing Agreement "is hereby amended to eliminate any of the Howard Parties' obligations thereunder." This provision, too,

18

indicates the Fee Sharing Agreement continues to be an enforceable agreement because it is being amended, not superseded or voided.

Yet, in other parts of the CSA, it seems that the Fee Sharing Agreement fails to survive. First, in the CSA, all parties agreed to release all varieties of claims each "has or ever had against [each other] prior to, through, and including this date, including, without limitation, Claims arising out of the existing financing arrangements between [them]." That statement unequivocally released claims to enforce financing arrangements that existed at the time the CSA was executed, which exactly describes the Fee Sharing Agreement.

And the CSA expressly stated that it "constitutes the entire agreement among the Parties and supersedes all prior or contemporaneous agreements and understandings (oral or written) with respect to the subject matter hereof." The subject matter of the CSA was the mutual release of claims and the future split of fees between Harris and Howard. The fee split between Harris and Howard was part of the earlier Fee Sharing Agreement between the two, causing this provision to indicate that the Fee Sharing Agreement is superseded by the CSA.

So, there are some CSA provisions that indicate the Fee Sharing Agreement was superseded by the CSA and other CSA provisions that indicate the Fee Sharing Agreement continued to exist and be subject to future amendments after the CSA was signed.

Finally, the CSA's attached Schedule I contemplated Virage making 12 monthly payments to Harris and stated that the payments "can be extended only at Virage's discretion," while the body of the CSA, in section 1, stated, "Upon continued compliance with this Agreement . . . the [Howard/Virage parties] shall make the Monthly Payments as set forth on the attached Schedule I." Reading these two provision together, as we must, adds to the ambiguity because, "continued compliance" could be read as limited to the 12-month term set forth in Schedule I or more expansively to include a future term during which the contractual rights are "extended . . . at Virage's discretion."

Whether the Fee Sharing Agreement continued to exist or was superseded by the CSA directly impacts whether Howard's 40% interest remained an enforceable right once Virage made its twelfth and final monthly payment. The dependence can be appreciated by comparing what the CSA says about future events with what the Fee Sharing Agreement said earlier.

First, we consider the CSA. The CSA wholly failed to state what would come of Howard's 40% interest in the fee from these cases at the natural end of the contract, whenever or however that end might occur. What it provided, instead, in section 6, was details on what was to occur in the event of a default. A default was defined as any of three possible developments:

1. the Howard Parties (with whom Virage had a pre-existing business relationship) default on any loan agreement between the Howard Parties and any Virage entity;

2. Harris or Howard fails to work and prosecute the subject cases with best efforts to facilitate a recovery on them; or

3. any other breach of the CSA by Harris or Howard.

Then, in section 16, it states that any breach by Harris would require Harris to repay to Virage any amounts Harris received under the CSA, and any action for breach of default would entitle the prevailing party to its fees and expenses incurred in connection with any future legal action, including reasonable attorney's fees. Thus, the CSA covers future rights in the context of a default but not in the context of a natural end to the agreement.

Conversely, the Fee Sharing Agreement has detailed statements about what was to happen when the relationship between Howard and Harris ended.[1] It stated that Howard would retain a right to reimbursement for any expenses paid on activated cases and a quantum meruit right for any efforts put into those activated cases but, otherwise, all inactive cases were to be returned to Harris with Howard ceasing to have any continuing rights to them.

Relying on the words in the contract to interpret the parties' intentions, it is unclear if the parties intended to leave unspecified what would occur once the CSA

---

[1] Recall that Virage was not a party to the Fee Sharing Agreement, only Howard and Harris.

21

ended or if they intended those features of the Fee Sharing Agreement to control. It is unclear because, at times, the CSA states that the Fee Sharing Agreement is superseded while, at other times, calls it merely amended.

We thus conclude that the CSA is ambiguous because the meaning of these provisions is uncertain and doubtful. *See In re Davenport*, 522 S.W.3d at 456; *Coker*, 650 S.W.2d at 393. We cannot ascertain and give effect to the intentions the parties objectively manifested in the written instrument because the writing is unclear. *See Finley Res.*, 672 S.W.3d at 339; *URI*, 543 S.W.3d at 763. There is a fact issue about what the parties intended by the words they chose, because of the discrepancies highlighted above. *See Coker*, 650 S.W.2d at 394. A factfinder must resolve the fact issues, relying on extraneous evidence of the parties' intentions. *See Progressive Cnty.*, 284 S.W.3d at 808–09; *Nat'l. Union Fire Ins.*, 907 S.W.2d at 520.

This is a determination we can make on appeal even if neither party pled or argued ambiguity and even though the trial court, likewise, interpreted the contract as though there were no ambiguities. *See J.M. Davidson*, 128 S.W.3d at 231; *Royal Maccabees*, 146 S.W.3d at 347 (involving appeal of jury verdict reduced to judgment).

We add that we are required to construe contracts from a "utilitarian standpoint bearing in mind the particular business activity sought to be served" and to avoid when possible a construction that is "unreasonable, inequitable, and

22

oppressive." *Frost Nat'l Bank*, 165 S.W.3d at 312 (quoting *Reilly*, 727 S.W.2d at 530). But, at the same time, contracting parties are the "masters of their own choices" and a court cannot change a contract into something else that might be better liked or needed than what the parties chose. *Thedford Crossing, L.P. v. Tyler Rose Nursery, Inc.*, 306 S.W.3d 860, 867 (Tex. App.—Tyler 2010, pet. denied); *see TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 193 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (Brown, J., dissenting).

In our view, bearing in mind the business activity sought to be served by the CSA, the trial court gave the CSA an unreasonable and inequitable construction. Before the CSA existed, the Harris and Howard parties operated under the Fee Sharing Agreement. Howard's interest in cases went down the more that Harris had worked up the case in preparation for trial or had invested funds in the process. Conversely, Howard's interest in cases went up where Harris had not yet invested time or money to develop them. Howard retained a right to reimbursement of his expenses and payment for his time and effort even if Howard and Harris did not ultimately resolve the cases together. And in the event the parties no longer worked together, Harris was to be returned all inactive cases for which, by definition, Howard had not spent any money or invested any time.

In stark contrast, the trial court interpreted the CSA to grant Howard a 40% interest in future attorney's fee awards in hundreds of inactive cases, in perpetuity,

in exchange for repaying Virage's transfer of funds to Harris for one year in an amount that was only slightly more than the annual salary Howard had been paying Harris until funds dried up and Virage's funds were brought into the arrangement. This is not a reasonable interpretation of a vague and ambiguous agreement made without the benefit of extraneous evidence to reveal the parties' intentions. Perhaps trial evidence will reveal the parties entered into such a drastically different arrangement on the second go-around but, without the benefit of that evidence, the parties' intentions are unclear in this contract that is ambiguous as a matter of law. *See In re Davenport*, 522 S.W.3d at 456.

We do not sustain Harris's first two issues. Instead, we hold that the CSA is ambiguous and that the trial court erred in interpreting it as a matter of law as an unambiguous contract. Because the proper course is to have a factfinder[2] determine the parties' intent after receiving extraneous evidence on the matter, we will reverse and remand—a result that no party requested but that is required because the contract is ambiguous.

The dissent would affirm the trial court's interpretation of the contract, even though it "do[es] not quarrel with [our] conclusion that the fee-sharing agreement is

---

[2]    We acknowledge that this was a bench trial and that, in such a proceeding, the trial court acts as a factfinder. Here, though, the parties prematurely shut off evidence at the trial court's suggestion so that the contract could be interpreted as a matter of law. Only one fact witness testified in the entire trial, and evidence was stopped before he was cross-examined. Fulsome factfinding simply did not occur.

24

ambiguous and that we therefore cannot interpret it as a matter of law on appeal." But this approach fails to account for our obligation to construe the contract and provide the relief that follows. *See J.M. Davidson*, 128 S.W.3d at 231; *White v. Moore*, 760 S.W.2d 242, 243 (Tex. 1988) ("Despite the parties' agreement that the will is unambiguous as a matter of law, we conclude otherwise and therefore reverse the summary judgment."). The dissent would enforce a contract it agrees the trial court misinterpreted on the theory that litigants generally are not entitled to relief they do not seek. *See Stevens v. National Education Centers, Inc.*, 11 S.W.3d 185 (Tex. 2000) (per curiam). But contract interpretation cases are different, and *Stevens* is distinguishable.

Unlike *Stevens*, Harris did not specifically disclaim remand. *Id.* at 186; *Majeed v. Hussain*, No. 2010 WL 4137472, at \*9 (Tex. App.—Austin Oct. 22, 2010, no pet.) (mem. op.) (*Stevens* "involved the oddity of a petitioner having explicitly requested the supreme court *not* to remand."). When an appellant has adopted a "rendition-or-bust" strategy by expressly rejecting the only available relief of remand, an appellate court is not authorized to remand the case to the trial court. *See id.*; *Garza v. Cantu*, 431 S.W.3d 96, 109 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("Here, however, the [appellant] did not adopt a 'rendition-or-bust' strategy. Though he failed to request a remand, he did not reject that relief. Thus, *Stevens* does not apply here.").

25

While Harris did not expressly request remand, he did not adopt a "rendition-or-bust" strategy that expressly rejects remand. Instead, Harris's request for relief contains many alternatives, including outcomes where the case is sent to arbitration for a "do over," the Court interprets the term "Released Cases," or any reversal that does not send the case to arbitration. And as a result, we are authorized to remand this case to the trial court. *See Advanced Pers. Care, LLC v. Churchill*, 437 S.W.3d 41, 49 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Although the Buyer has requested rendition rather than remand, remand is the relief to which it is entitled. We therefore reverse the trial court's judgment and remand the case." (citations omitted)); *First-Citizens Bank & Tr. Co. v. Francis*, No. 14-20-00179-CV, 2022 WL 619711, at *8 n.6 (Tex. App.—Houston [14th Dist.] Mar. 3, 2022, no pet.) ("While the doctors argue remand is waived because First-Citizens requested only rendition, such a result would be warranted only if First-Citizens specifically requested that we *not* remand, which is not the case here." (emphasis in original)).

This result is consistent with the Texas Rules of Appellate Procedure that must guide our disposition of this case. "[I]t is [the relevant appellate rule], and not the prayer for relief, that determines the disposition of the case." *Kaspar v. Thorne*, 755 S.W.2d 151, 157 (Tex. App.—Dallas 1988, no writ). Therefore, "the failure of a prayer for relief to request [a particular disposition] does not prevent an appellate court from granting such relief on a meritorious . . . point of error which is clearly

26

presented in an appellant's brief." *Olin Corp. v. Dyson*, 678 S.W.2d 650, 657 (Tex. App.—Houston [14th Dist.] 1984), *rev'd on other grounds*, 692 S.W.2d 456 (Tex. 1985).

Under Texas Rule of Appellate Procedure 43.3, "[w]hen reversing a trial court's judgment, [we] *must* render the judgment that the trial court should have rendered" (emphasis added). Exceptions to this general rule allow a remand when, for example, further proceedings are necessary—as they are here. *See* TEX. R. APP. P. 43.3(a). In this way, Rule 43.3 "sets out two possible dispositions when [the appellate] court chooses to reverse a lower court's judgment: rendition and remand." *Kaspar*, 755 S.W.2d at 157. But nowhere does the rule suggest that when a trial court's judgment should be reversed, we must instead *affirm it* if the appellant fails to request the correct post-reversal disposition. And Rule 44.3 casts doubt on the practice of relying on formal defects or irregularities to transform a reversal into an affirmance. *See* Tex. R. App. P. 44.3 (court cannot "affirm or reverse a judgment . . . for formal defects or irregularities in appellate procedure without allowing a reasonable time to correct or amend the defects or irregularities"); *accord Kaspar*, 755 S.W.2d at 157.

A number of Texas appellate courts agree with this approach and hold that an appellate court is empowered either to render judgment or remand for new trial based on its own application of Rule 43.3 without regard to whether the appellant

specifically prayed for that relief. *See, e.g.*, *Ibrahim v. Young*, 253 S.W.3d 790, 807 (Tex. App.—Eastland 2008, pet. denied); *Jakab v. Gran Villa Townhouses Homeowners Assoc., Inc.*, 149 S.W.3d 863, 870 n. 7 (Tex. App.—Dallas 2004, no pet.) (citing *Kaspar*, 755 S.W.2d at 156–58); *Resource Savs. Ass'n v. Neary*, 782 S.W.2d 897, 903–04 (Tex. App.—Dallas 1986, writ denied)); *National Café Servs., Ltd. v. Podaras*, 148 S.W.3d 194, 200–01 (Tex. App.—Waco 2004, pet. denied).

To fulfill our obligation to determine whether the CSA is ambiguous and to follow the rules of appellate procedure, we cannot be limited to the relief Harris requested because the parties believed the CSA was unambiguous. *Stevens* does not require otherwise. Accordingly, we reverse and remand. But before doing so, we address Harris's last two issues on appeal.

## Fee Sharing with a Disbarred Attorney

In his third issue, Harris contends the trial court erred by allowing a disbarred attorney, Howard, to keep an interest in unearned legal fees without being able to contribute to the cases' development.

We hold that this issue is not yet ripe given our holding on issues one and two. On remand, a factfinder will determine whether a right to 40% of the fees survived the twelfth and final monthly payment made to Harris by Virage. Until the ambiguous contract is interpreted, it is unclear if the Howard parties will have a right

28

to any fee on these cases. If the Howard parties have no right, then Harris's arguments on this issue will become moot.

This issue will be resolved in the first instance by the trial court on remand. Harris's third issue is overruled as not yet ripe for resolution.

**Denied Motion for Mediation/Arbitration**

Howard brought his declaratory judgment action in March 2019, and Virage immediately intervened. Harris made a special appearance and answered subject to the special appearance. The appellate record does not include the trial court's order on the special appearance, but the case continued, with Harris filing amended answers in August 2020, September 2020, and October 2020. Then, in late October 2020, Harris moved to compel mediation and arbitration, citing the Fee Sharing Agreement, and moved to stay the proceedings. Howard responded.

Howard argued that (1) the arbitration provision in the Fee Sharing Agreement was superseded by the CSA, which had a clause requiring the parties to submit to the jurisdiction of state courts in Houston, Texas, and another clause stating that "[a]ny claims concerning this Agreement shall be brought and litigated in a state or federal court sitting in Houston, Texas," (2) the controversy at issue in this declaratory judgment action is not within the scope of the Fee Sharing Agreement's arbitration provision, which was limited to "any disagreement regarding the implementation of this AGREEMENT," *i.e.*, the Fee Sharing Agreement, and (3)

29

Harris waived any right to arbitrate by aggressively participating in litigation before moving for arbitration.

The trial court denied the motion to compel arbitration. The order does not include any fact findings, but it does state that the trial court considered the parties' pleadings and relevant "arguments, authorities, evidence, including the docket activity in this Court."

We agree with Howard that the right to mediation and arbitration found in the Fee Sharing Agreement has been superseded. This holding is not inconsistent with our holding above, concluding that the CSA is ambiguous as a matter of law regarding the continuing existence of a right to a fee split. There, the CSA is contradictory regarding the continuation of obligations. Here, on the other hand, the second agreement expressly supersedes the first.

The first agreement in time, the Fee Sharing Agreement, was between Harris's firm and Howard's firm only. Harris and Howard, individually, were not parties to the agreement, nor was Virage. The Fee Sharing Agreement granted a right to non-binding mediation and, if that failed, to binding arbitration with a specified Florida arbitrator.

The second agreement in time, the CSA, was between Harris and his firm, Howard and his firm, and Virage and its related entities. It states that any claims concerning the CSA "shall" be brought and litigated in Texas state court. Harris

might have an argument that interpreting the CSA implicates the Fee Sharing Agreement, but he has no argument that the CSA's provision failed to supersede the arbitration provision, as detailed below.

The CSA states, in section 2, that Harris and his firm agree not to commence any type of proceeding to enforce any claim "arising out of the existing financing arrangements between" Harris and Howard that existed before or on the date the CSA was signed, which would include enforcing a right to arbitrate under the Fee Sharing Agreement.

The CSA further states, in section 4(a), that it "eliminate[s] any of the Howard Parties' obligation" under the Fee Sharing Agreement, which would include the obligation to mediate/arbitrate.

And the CSA unequivocally states, in section 16, that any claims concerning the CSA "shall" be brought in state or federal court in Houston, Texas, and that each party to the agreement, which includes Harris and Harris's firm, "consents to personal jurisdiction and venue by such courts over such Party and waives any defense with respect thereto." Harris's alleged right to mediate/arbitrate is a defense to proceeding in the Texas state courts, which he expressly waived when executing the CSA. *See TransCore Holdings, Inc. v. Rayner*, 104 S.W.3d 317, 323 (Tex. App.—Dallas 2003, pet. denied) (holding that trial court did not abuse its discretion in denying party's motion to arbitrate given that right to arbitrate was in earlier

31

agreement, parties released each other from previous obligations, parties agreed to jurisdiction of Texas courts in second agreement, and that provision conflicts with earlier, released obligation to arbitrate).

The trial court did not err in denying the motion to arbitrate that was based on an earlier agreement between just some of the parties and later was superseded by an agreement among a larger group of parties requiring related claims to be litigated in a Texas court.

We overrule Harris's fourth and final issue.

## Conclusion

We reverse the trial court's final judgment in which it construed the parties' contract as a matter of law and remand for additional proceedings to allow a factfinder to interpret the parties' contract, giving due consideration to evidence of the parties' intent.


Sarah Beth Landau
Justice

Panel consists of Justices Goodman, Landau, and Hightower.

Justice Goodman, dissenting.